**UNITED STATES**

v.

**Senior Airman David T. McDUFFIE,**
**United States Air Force.**

ACM 36431.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 13 May 2005.

4 May 2007.

Appellate Counsel for Appellant: Captain Anthony D. Ortiz (argued), Colonel Nikki A. Hall, and Lieutenant Colonel Mark R. Strickland.

Appellate Counsel for the United States: Captain Donna S. Rueppell (argued), Colonel Gerald R. Bruce, Colonel Gary F. Spencer, Lieutenant Colonel Robert V. Combs, and Major Matthew S. Ward.

Before BROWN, JACOBSON, and SCHOLZ, Appellate Military Judges.

## OPINION OF THE COURT

SCHOLZ, Judge:

Contrary to his pleas, the appellant was convicted of one specification of reckless driving in violation of Article 111, UCMJ, 10 U.S.C. § 911, and one specification of involuntary manslaughter in violation of Article 119, UCMJ, 10 U.S.C. § 919. A panel of officer and enlisted members sentenced the appellant to a bad-conduct discharge, confinement for 1 year, and reduction to the grade of E–2. The convening authority approved the findings and sentence as adjudged.[1]

The appellant raises three allegations of error: 1) The government violated his Rule for Courts–Martial (R.C.M.) 707 right to a speedy trial; 2) The evidence is legally and factually insufficient to support his conviction of the offenses; and 3) The court-martial was improperly convened for failure to seat a member listed on the convening order.[2]

### Background

In August 2004, the appellant drove a co-worker, Senior Airman (SrA) R, from RAF Fairford, United Kingdom (UK) to RAF Croughton, UK, for a medical appointment. The two bases were approximately an hour's drive apart. The pair reached RAF Croughton safely, but on the return trip the appellant failed to negotiate a left curve in the road and veered into the oncoming lane of traffic. SrA R noticed the danger and yelled out a warning, but the appellant's efforts to correct the direction of his car came too late. He hit an oncoming car, head-on, and killed the driver, a pregnant British woman. The woman's unborn fetus also perished. Prior to the accident, the appellant was driving his American-made car on the left-hand side (the correct side in England) of the road. SrA R was in the front passenger seat, closest to the center of the road. When the car failed to follow the curve in the road and crossed into the right-hand lane, SrA R's side of the vehicle took the brunt of the head-on collision, and he was severely injured. A woman who was driving behind the appellant skidded into the appellant's car when it came back into the left lane after the initial collision. She suffered only minor injuries.

---

1. This Court heard oral argument in this case on 20 February 2007.

2. In response to this assignment of error, this Court granted the government's motion to submit this member's request for excusal and the staff judge advocate's excusal memorandum, both signed prior to trial, thus correcting this deficiency.

## Speedy Trial

As he did at trial, the appellant asserts the government violated his right to a speedy trial under R.C.M. 707. Prior to trial, the defense moved to dismiss the case, arguing that the Article 32, UCMJ, 10 U.S.C. § 832, investigating officer (IO) lacked the authority to exclude days for speedy trial purposes pursuant to R.C.M. 707. The defense supported its argument by pointing to the fact that the special court-martial convening authority (SPCMCA) attempted, in writing, to exclude even more time from the speedy trial clock, albeit after the general court-martial convening authority (GCMCA) had referred the case to trial. The military judge found no speedy trial violation, nor do we.

In the IO appointment letter, the convening authority initially scheduled the Article 32, UCMJ, investigation for 4 January 2005. Based on conflicts with the schedules of the trial counsel, trial defense counsel, and the IO, the hearing was rescheduled for 14 February 2005. In an email to the parties, setting the new date, the IO said: "The period of time between 4 January 2005 and 25 February 2005 (or the completion of my report, whichever occurs sooner) is excluded (RCM 707 *Speedy Trial*). Any objections to the exclusion of this time shall be made to me in writing [no later than] 29 December 2004." [3]

 Whether an appellant received a speedy trial is a question we review de novo. *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F.2003); *United States v. Doty*, 51 M.J. 464, 465 (C.A.A.F.1999). We give substantial deference to findings of fact made by the military judge and will not overturn such findings unless they are clearly erroneous. *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F.2005); *Cooper*, 58 M.J. at 58.

R.C.M. 707(a) provides, in part, that a military accused must be brought to trial within 120 days after the earlier of "preferral

of charges" or "the imposition of restraint under R.C.M. 304(a)(2)-(4)." [4] However, not all of those days automatically count against the 120–day speedy trial clock. R.C.M. 707(c) provides that delays authorized by a military judge or the convening authority are excludable.

In denying the appellant's speedy trial motion, the military judge adopted, as part of his findings of fact, a chart which was part of the government's response to a defense motion to dismiss for violation of the appellant's right to speedy trial. This chart reflected 41 days which were excluded based on the delay of the Article 32, UCMJ, investigation from 4 January 2005 until it convened on 14 February 2005.[5] This put the government at 109 days, from preferral of charges to the day of arraignment. The military judge, referring to *United States v. Thompson*, 46 M.J. 472 (C.A.A.F.1997), found that a military judge has the same authority to ratify an Article 32, UCMJ, IO's decision to exclude time post-referral as a convening authority would have pre-referral. The military judge went on to find the IO's decision to delay the Article 32, UCMJ, investigation was reasonable. In making his de novo review of this delay decision, the military judge said one of the factors he considered in determining its reasonableness was that this IO was also a military judge, and he therefore gave his decision some deference.

 "Prior to referral, the convening authority may delegate the authority to grant continuances to an Article 32[IO]." R.C.M. 707(c)(1), Discussion. Additionally, where, as here, the convening authority has delegated to an IO the "authority to grant any reasonably requested delays of the Article 32 investigation," then any delays approved by the Article 32, UCMJ, IO also are excludable. *United States v. Lazauskas*, 62 M.J. 39, 41 (C.A.A.F.2005).[6] Thus, when an IO has been

---

3. We note the record reflects no objections were made during this timeframe.

4. There was no pretrial restraint in this case.

5. There is some confusion as to the exact start date of the Article 32, UCMJ, hearing but we do not need to address this issue, as the defense at trial agreed to these dates and our holding is not

affected by whether or not it started on 14 February 2005 or 7 February 2005, as reflected in the Article 32, UCMJ, report.

6. During oral argument, appellate defense counsel argued this case should not be applied retroactively. We disagree. This case explains and applies R.C.M. 707 and does not establish new law.

delegated authority to grant delays, the period covered by the delay is excludable from the 120–day period under R.C.M. 707. *Id.* If the issue of speedy trial under R.C.M. 707 is raised before the military judge at trial, the issue is not which party is responsible for the delay but whether the decision of the officer granting the delay was an abuse of discretion. *Id.* When reviewing such delays, the focus is on whether a qualified authority approved the delay, not which party is responsible for the delay. *Id.* As long as the length of the delay is reasonable and approving it was not an abuse of discretion, it is excluded from the 120–day speedy trial clock. *Id.* at 41–42.

▇▇ We find the military judge did not abuse his discretion in excluding the time period from the initial date set for the Article 32, UCMJ, hearing to the date it was rescheduled by the IO. However, we disagree with the military judge's conclusion that the Article 32, UCMJ, IO did not have authority to exclude this time period for R.C.M. 707 purposes. The IO was given authority in his appointment letter to grant delays of the Article 32, UCMJ, hearing. The SPCMCA's attempt to ratify this exclusion of time after the case was referred to trial by the GCMCA was ineffective and did not change the IO's authority in this case. The SPCMCA did not expressly withhold the authority to exclude time for speedy trial purposes and his attempted ratification of the IO's actions, while without legal effect, indicates the SPCMCA found the delay to be reasonable. We further find the Article 32, UCMJ, IO had the authority not only to delay the hearing, but also to exclude this time period from the government's speedy trial clock. R.C.M. 707; *Lazauskas*, 62 M.J. at 42. Our review of the record also convinces us that the IO's exclusion of the time period between 4 January 2005 and 25 February 2005 was reasonable and not an abuse of discretion. Therefore, we hold that less than 120 days elapsed between preferral of charges and arraignment, and the appellant's right to a speedy trial under R.C.M. 707 was not violated.

### Legal and Factual Sufficiency

▇▇ In his second assignment of error, the appellant claims the evidence was legally and factually insufficient to support his conviction. We review the appellant's claim of legal and factual insufficiency de novo, examining all the evidence properly admitted during the findings portion of the trial. *See* Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Beatty,* 64 M.J. 456, 459 (C.A.A.F.2007); *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F.2002). The test for legal sufficiency is whether, considering the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Quintanilla,* 56 M.J. 37, 82 (C.A.A.F.2001); *United States v. Turner,* 25 M.J. 324 (C.M.A. 1987). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of the appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325. For the reasons set out below, we set aside the findings of guilty of involuntary manslaughter and reckless operation of a vehicle and find the appellant guilty of the lesser included offense of negligent homicide in violation of Article 134, UCMJ, 10 U.S.C. § 934.

The elements of involuntary manslaughter by culpable negligence are as follows:

(1) That a certain named or described person is dead;

(2) That the death resulted from the act or omission of the accused;

(3) That the killing was unlawful; and

(4) That this act or omission of the accused constituted culpable negligence . . .

*Manual for Courts–Martial, United States (MCM),* Part IV, ¶ 44b(2) (2005 ed.).

*MCM,* Part IV, ¶ 44c(2)(a)(i) defines culpable negligence as follows:

Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission.

We apply an objective test in determining whether the consequences of an act are foreseeable. *United States v. Riley*, 58 M.J. 305, 311 (C.A.A.F.2003); *United States v. Oxendine*, 55 M.J. 323, 326 (C.A.A.F.2001).

The elements of reckless operation of a vehicle are:

1) That the accused was operating or in physical control of a vehicle, aircraft, or vessel; and

2) That while operating or in physical control of a vehicle, aircraft, or vessel, the accused:

a) did so in a wanton or reckless manner....

*MCM*, Part IV, ¶ 35b (2005 ed.).

Recklessness is defined as "a culpable disregard of foreseeable consequences to others from the act or omission involved." *Id.* at ¶ 35b(7). Wanton "connote[s] willfulness, or a disregard of probable consequences." *Id.* at ¶ 35b(8).

The members were also instructed on the lesser included offense of negligent homicide, in violation of Article 134, UCMJ. The elements of this offense are as follows:

(1) That a certain person is dead;

(2) That this death resulted from the act or failure to act of the accused;

(3) That the killing by the accused was unlawful;

(4) That the act or failure to act of the accused which caused the death amounted to simple negligence; and

(5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*MCM*, Part IV, ¶ 85b (2005 ed.).

*MCM*, Part IV, ¶ 85c(2) defines simple negligence as the absence of due care, that is, an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care of the safety of others which a reasonably careful person would have exercised under the same or similar circumstances.

The government's presentation of its case for both charged offenses necessarily focused on the issue of negligence. The trial counsel's theory of the case was that the appellant was culpably negligent because he knew he suffered from severe sleep apnea and had been warned that he should not drive when sleepy. The government posited the appellant nonetheless drove on that fateful day and fell asleep at the wheel, a decision that resulted in the accident. The appellant's injured passenger, who had been promoted to Staff Sergeant (SSgt) by the time of trial, testified he made the trip to RAF Croughton with the appellant approximately four or five times before the accident. The appellant drove each time because SSgt R was not licensed to drive in the UK. On the day of the crash, they started the trip to RAF Croughton at about noon and stopped for lunch on the way up. SSgt R said that, on the way back, they would typically stop at a gas station about half way and the appellant would get an energy drink, while SSgt R got a Coke. On this particular trip they did not stop. When the trial counsel asked him if this surprised him, the witness said a little bit, but he did not have a problem with it because he (SSgt R) wanted to get home.

SSgt R testified as follows:

In the car accident we were driving along, we came upon a curve that turned left and we kept going straight. As soon as the wheels went over the median I yelled something at him. I don't remember what I yelled. He kind of looked up and tried to jerk the car back into the left-hand lane and it was too late by then. We hit head-on with an oncoming car ... he kind of looked like he looked straight up and turned the wheel, kind of simultaneously.

In response to the trial counsel asking SSgt R if the appellant appeared to be asleep, SSgt R said, "his head was down like he was, but I couldn't tell if his eyes were closed or not." When pressed on cross-examination, SSgt R said, "I don't know for a fact if he was asleep; I'm pretty sure he was." The defense later confronted the witness with his prior Article 32, UCMJ, testimony wherein he had testified,

I did not see [the appellant] sleep that day in the car. I saw him pull up and I told

him to look out. I couldn't tell if he was asleep or not. I saw him look up a bit, but I can't really say if he was asleep, if his eyes were closed or if he wasn't keeping his eyes on the road.

He also testified he could not remember the appellant doing anything distracting in the car, such as eating, or talking on a cell phone, and that they were going about 50 miles per hour, the posted speed limit.

The British police constable who responded to and secured the scene testified he gave the appellant a breathalyzer test at the scene, which was negative for alcohol. He also testified the appellant's blood had been drawn and tested at the hospital shortly after the accident. The test was negative for alcohol and narcotic drugs, but a trace amount of caffeine was found.

While the evidence was inconclusive with regard to whether or not the appellant had fallen asleep at the wheel, there was testimony about his sleep apnea condition. A doctor from Lackland Air Force Base, Texas, testified as an expert in sleep disorders. She said the appellant had been diagnosed with severe sleep apnea in 2000. She personally treated the appellant one time in 2002. He had self-identified as having sleep problems and had gained 16 pounds. This appointment was a follow-up, which resulted in the pressure being increased in the appellant's Continuous Positive Airway Pressure (CPAP) machine.[7] The doctor saw the appellant on the morning after the hospital staff had increased the pressure on his CPAP machine and observed him overnight. The next morning he felt better, so they changed his prescription that day. She said the appellant told her he used the CPAP machine at least four nights a week. She then told him to use it every night. She also testified she told the appellant he must not drive when sleepy. She said the hospital staff give a kind of "packaged" counseling to every patient with sleep apnea in which patients are told that if they drive when sleepy, they face from 3–8 times greater risk of being involved in a motor vehicle accident.

The expert further testified she recommended to the appellant that he have a follow-up appointment in six months, but she saw no evidence in his record he had done this. The defense counsel asked her, "Isn't someone who needs the machine to treat sleep apnea not worldwide qualified?" She responded that those who are dependent on the machine are not worldwide qualified. When asked about whether or not the appellant had a medical evaluation board for sleep apnea, the doctor responded she was not aware of one. She further testified that, to her knowledge, the appellant was not worldwide qualified. She became aware he was in the UK two weeks before his court-martial. She also testified it is possible that someone with sleep apnea could fall asleep without warning, but it was not likely.

A co-worker of the appellant who worked with him for a year-and-a-half testified he saw the appellant fall asleep at his computer at work once, after lunch. He thought it was an isolated incident. On cross-examination, this witness admitted it happens to everybody. The witness also said he and the appellant have a pretty strenuous job, so he did not find it abnormal since it was after lunch. He also testified the appellant was certified to drive forklifts, bobtails, and pick-up trucks on the flight line and still continued to do so after the accident. He also said the appellant had driven him to RAF Croughton once without incident, and that he did not stop on either leg of the trip. He found out about the appellant's sleep apnea after the accident and saw the CPAP machine when he was at the appellant's home watching the appellant's dogs for a couple of days.

The appellant's first supervisor at RAF Fairford testified he saw the appellant fall asleep two times while at work over a 14–month period. On one occasion the appellant was in front of a computer and on the other occasion, the appellant was under a piece of equipment with his hand over the axle. This witness had also gone to RAF Croughton with the appellant. The appellant drove, and while they stopped and had lunch on the way

---

7. The doctor testified, "This is a device that is run by electricity and blows air in under a stan-

dardized pressure, water pressure, to descend to open the airways."

there, they did not stop for anything on the way back.

A forensic crash investigator testified that, in his opinion, the accident was "entirely consistent" with someone falling asleep behind the wheel. He also said one could see the upcoming bend in the road for about 1000 feet prior to making the turn. During cross-examination, he said the accident could also have been caused by a considerable lapse of concentration, like prolonged looking in the rear view mirror. He also testified the appellant's vehicle was in the wrong lane for only about a second-and-a-half.

■ Based on our review of the record of trial in this case, we find the trial court's findings to be legally sufficient. That is, considering the evidence in the light most favorable to the prosecution, we believe a reasonable fact finder could find all the essential elements of both involuntary manslaughter and reckless driving beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

■ However, we hold the findings in this case to be factually insufficient.[8] The evidence of record does not convince this Court that the appellant's actions rose to the level of culpable negligence required to sustain a conviction for involuntary manslaughter or reckless driving. The appellant, despite having been diagnosed with sleep apnea four years prior to this accident, was licensed to drive in Europe and, in fact, his Air Force job required him to drive large vehicles on the flight line. The Air Force was presumably in possession of the appellant's medical records and aware of the appellant's condition. There was no evidence the appellant was likely to fall asleep on this particular trip or had ever done so before while driving. There was no evidence the appellant was not following his CPAP treatment.

The evidence did show he was not doing anything to distract his attention from operating his car, and was not speeding. In fact, SSgt R said the appellant did not appear tired, and they engaged in conversation 5 to

10 minutes prior to the accident and were listening to music.

After our careful review of the evidence, we are not convinced beyond a reasonable doubt that the appellant acted with a culpable disregard for the foreseeable consequences of his actions when, whether due to his falling asleep or inattentiveness, he crossed the center line into oncoming traffic while operating his vehicle.

■ We do, however, conclude that the appellant failed in his duty to operate his vehicle with due care for the safety of other drivers when he crossed into oncoming traffic. In so doing, the appellant failed to exhibit the degree of care a reasonably careful person would have exercised under the same or similar circumstances. Under the facts of this case, the appellant's operation of his vehicle immediately preceding the fatal crash amounted to simple negligence. The resulting death of a British national by the appellant's negligent operation of his vehicle was not only tragic, but also prejudicial to good order and discipline and of a nature to bring discredit upon the armed forces.[9] We thus find beyond a reasonable doubt that the appellant committed the offense of negligent homicide, and so hold. We therefore set aside and dismiss the appellant's conviction for the charges of involuntary manslaughter and reckless operation of a vehicle.

### Sentence Reassessment

Because we set aside the findings of guilty of involuntary manslaughter and reckless operation of a vehicle, having instead found the appellant guilty of the lesser included offense of negligent homicide, we must determine whether we can reassess his sentence. If we can determine that, "absent the error, the sentence would have been at least of a certain magnitude," then we "may cure the error by reassessing the sentence instead of ordering a sentence rehearing." *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F.

---

8. Pursuant to Article 66(c), UCMJ.

9. See an interesting and non-binding historical discussion on this very topic in *United States v. Jaekley*, ACM 2927 (A.F.B.R.1951) (The Judge Advocate General of the Air Force and the then-Air Force Board of Review grapple with issues related to levels of negligence and criminal liability in a reckless driving case).

**638**

2002) (citing *United States v. Sales*, 22 M.J. 305, 307 (C.M.A.1986)). We are able to do so in this case. We find the members would have imposed a sentence of no less than confinement for 1 year and reduction to E–2, based on the appellant's conviction for negligent homicide alone. We therefore set aside the bad-conduct discharge and reassess the appellant's sentence as follows: confinement for 1 year and reduction to the grade of E–2.

We further find this reassessed sentence to be appropriate. *See United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982); *see also United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F.1999); *United States v. Healy*, 26 M.J. 394, 395 (C.M.A.1988).

*Conclusion*

The findings, as modified, and sentence, as reassessed, are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ; *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.