# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39816**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Abrom SMITH IV**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 5 May 2021

————————————

*Military Judge:* Wesley A. Braun.

*Sentence:* Sentence adjudged on 30 July 2019 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey. Sentence entered by military judge on 10 September 2019: Bad-conduct discharge, confinement for 2 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major M. Dedra Campbell, USAF; Major Rodrigo M. Caruço, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial composed of officer members found Appellant guilty of one specification under Charge I of involuntary manslaughter of KW, by striking her with his car, in violation of Article 119, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 919.[1] Appellant was also found guilty of one specification under Charge II of negligent homicide of KW, in violation of Article 134, UCMJ, 10 U.S.C. § 934, which was charged in the alternative for exigencies of proof. The military judge informed the members at the beginning of the presentencing proceeding, as well as in the sentencing instructions, that they were to sentence Appellant only for Charge I and its specification. Appellant was sentenced to a bad-conduct discharge, confinement for two years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the adjudged sentence. The entry of judgment reflects that the military judge "[c]onditionally dismissed" Charge II and its specification "if the specification of Charge I and Charge I are affirmed" on appeal.

Appellant raises six issues on appeal: (1) whether the military judge erred in excluding evidence of a speed study conducted by Appellant's expert; (2) whether the military judge erred in admitting evidence from the Government's forensic pathologist regarding an estimate of the speed Appellant was traveling at the time he struck the victim; (3) whether Appellant's convictions are legally and factually sufficient; (4) whether the military judge erred in failing to provide a defense-requested instruction on culpable negligence; (5) whether Appellant is entitled to relief due to the convening authority's failure to take action on his sentence; and (6) whether Appellant was denied effective assistance of counsel when his trial defense counsel failed to admit corroborating testimony regarding the weather conditions on the day of the accident.[2] We have carefully considered issues (4), (5), and (6), and have determined those

---

[1] All references in this opinion to the punitive articles of the Uniform Code of Military Justice (UCMJ), are to the *Manual for Courts-Martial, United States* (2016 ed.). The charges and specifications were referred to trial after 1 January 2019; as such, all other references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.). *See* Exec. Order 13,825, §§ 3 and 5, 83 Fed. Reg. 9889, 9890 (8 Mar. 2018).

[2] Appellant personally raised issue (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

issues do not warrant relief.[3] *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

We find Appellant's convictions both legally and factually sufficient, and no error materially prejudicial to the substantial rights of Appellant occurred. We thus affirm Appellant's conviction for involuntary manslaughter. We also affirm the judgment of the court-martial that dismissed Appellant's conviction for negligent homicide, charged in the alternative as Charge II, on the condition that Appellant's conviction for involuntary manslaughter is affirmed on appeal. *See United States v. Stanley*, 60 M.J. 622, 630 (A.F. Ct. Crim. App. 2004) ("[M]ilitary appellate courts have the inherent authority to order a conditional dismissal of a charge which becomes effective when direct review becomes final . . . ." (citing *United States v. Britton*, 47 M.J. 195, 202–05 (C.A.A.F. 1997) (Effron, J., concurring) (approving conditional dismissal of lesser offense in the interest of judicial economy))). Thus, we conditionally dismiss Charge II and its specification without prejudice to reinstatement should the more serious charge be dismissed on further review before the case becomes final.

## I. BACKGROUND

On 2 July 2018, sometime between 0445 and 0510, KW, the 48-year-old victim in this case, left her residence in Brown Mills, New Jersey, to take a walk. PW, KW's husband, testified he left their house at 0445 to go for a run; KW left after him, wearing a neon shirt. The route KW took required her to cross Choctaw Drive, a two-lane road in a residential neighborhood, with a posted speed limit of 25 miles per hour. There are no sidewalks at this part of Choctaw Drive, but there was a crosswalk. Right before the crosswalk, there is a "BLIND PERSON AREA" sign. When she crossed the road, KW normally used the crosswalk. On this particular morning, she had her husband's cell phone with her because she listened to music; the cell phone was secured to her arm with a band.

At approximately 0500 on 2 July 2018, Appellant left his house in Brown Mills, New Jersey, in his small passenger car vehicle to drive to his assigned place of work at Joint Base McGuire-Dix-Lakehurst.[4] Appellant had lived at

---

[3] Regarding issue (4), the military judge provided the standard instruction on culpable negligence. Regarding issue (5), consistent with the respective opinions of the judges of this panel in *United States v. Barrick*, No. ACM S32579, 2020 CCA LEXIS 346 (A.F. Ct. Crim. App. 30 Sep. 2020) (unpub. op.), and subsequent opinions, we find no error in the convening authority's decision to "take no action on the sentence in this case."

[4] Appellant did not testify during trial, but interviewed with a police detective from the Pemberton Township (New Jersey) Police Department on 13 July 2018. Appellant's

this house for five months on the day in question. Appellant's duty shift was from 0600 to 1400; he was expected to be at work at 0520 to "arm up" and "get [a] pre-brief." When Appellant left his residence, the sun was not up yet, and his automatic headlights were on when he started his drive. Prior to leaving his house, Appellant situated his phone in his car to listen to a podcast, and then put his phone on the passenger seat. Appellant also had his driver's side window down when he started his drive to work.

It was a "normal day" for Appellant. He drank a protein shake in the car, and took his usual route to work. After Appellant left his residence, he drove on Chippewa Trail, then made a right turn on to Spring Terrace. He continued on Spring Terrace, which becomes a winding bridge over water, and at the end of the bridge is called Choctaw Drive. The roadway also contained a slight downward curve over a bridge, which created an area of decreased visibility. As such the road appears to be designated as a no passing zone based upon signage placed along the side of the road in the direction the accused was traveling. Appellant stated, "I was driving down, drove over the bridge. As soon as I hit the end of the bridge, my windshield fogged up. That happened, I saw the woman and I - - it was like [snaps fingers] that." (Alteration in original).

Appellant stated he saw KW's neon shirt and struck her with his car while she was in the crosswalk. Before the impact he did not turn on his windshield wipers or his car's defroster. When police asked how fast he was going over the bridge, Appellant stated, "I usually go 30 over the bridge. Because the limit is 25, I usually go five miles faster." Importantly, when police asked if Appellant applied the brakes when he saw KW, he responded, "Like I hit her so it wasn't – like I didn't apply the brakes like before I hit her. *So once I hit her, then I applied the brakes*." (Emphasis added).

The accident occurred at approximately 0508. After Appellant hit KW, he put his car in park, got out of the car, and at 0510 called 911. Appellant checked KW's pulse and attempted CPR, but, a few minutes after calling 911, the local police arrived at the scene and pronounced KW dead. Appellant opined,

> If my windshield hadn't -- actually if my windshield hadn't fogged up, I might have been able to swerve out of the way maybe. But, I mean, maybe if she would have saw my headlights. I mean, I don't know. I mean, it could have and it couldn't have because it all happened so fast.

At trial, the parties hotly contested the speed Appellant was traveling when he struck KW, and, given all the circumstances, whether Appellant's driving

---

interview was video recorded by the Pemberton police, marked as Prosecution Exhibit 8, played during the Government's case, and transcribed in the record of trial.

constituted culpable negligence when he struck her. Appellant challenged opinions by the Government's expert witnesses as to his actual speed when he struck KW, which was estimated at 47 to 57 miles per hour. Appellant also sought to introduce evidence that traveling around 35 miles per hour, versus the 25 miles per hour posted speed limit, was reasonable.

## II. DISCUSSION

## A. Admissibility of Expert Testimony

### 1. Additional Background

#### a. Government motion to exclude speed-study evidence

During the Defense's case-in-chief, trial defense counsel sought to introduce evidence of a speed study conducted by Appellant's expert in accident reconstruction, JD. According to trial defense counsel, the speed study provided data about the speed that reasonable, prudent drivers felt comfortable traveling on the road where KW was struck by Appellant's car. Trial counsel objected to JD's proposed testimony, arguing the speed study was not "fully conducted," and that an opinion by JD would not be relevant and would fail a Mil. R. Evid. 403 balancing test because the results were based on insufficient data and would mislead the members.

At an Article 39(a), UCMJ, 10 U.S.C. § 839, session, JD testified about the proffered information. As a municipal and traffic engineer, JD outlined his experience in the setting of speed limits, and the requirements needed to determine whether a speed limit at a particular area should be changed. In late June 2019, on behalf of Appellant, JD conducted a speed study on Choctaw Drive where KW was struck and killed.[5] Despite his intent to have a week's

---

[5] JD testified that

> [A] speed survey is to measure the speed of vehicles traveling along a roadway in an unencumbered, unrestricted free flow condition. That means that there's no other vehicles ahead of them that may be keeping them back. Let's just take individual vehicles as they come through and measure their speed, so that's the way the speed survey is done. You need a minimum of a hundred vehicles in order to really form sufficient data upon which to determine the 85th percentile speed. The best way to do that . . . was to install an actual traffic counter at the location, leave that in place, and then measure unsuspecting vehicles as they pass across the road tubes, which are two rubber tubes . . . that will determine not only the volume, but also the speed if placed at a proper location apart.

worth of data, there was a malfunction with the equipment JD used to conduct his study, and thus, he was able to collect data over a four-hour period only, which counted 700 vehicles passing at or near the scene where KW was struck.[6] However, JD noted that a traffic count of 100 vehicles would be an adequate sampling.

The study provided data on the speed of the vehicles and the direction they were traveling. Based on his study, conducted nearly a year after the accident, JD stated that 85 percent of travelers were driving at a speed of up to 37 to 38 miles per hour in the lane Appellant was driving on the morning of the accident. Therefore, rounding down to the "nearest five miles per hour," JD opined that an appropriate speed limit on Choctaw Drive in the area of the accident would be 35 miles per hour, "based upon the character of the road being in a suburban residential district."

In his oral ruling on the issue, the military judge made the following findings "supported by a preponderance of the evidence":

> JD has significant experience in traffic engineering, and the management of traffic speeds for the purposes of helping municipalities and setting traffic speed limits.
>
> . . . .
>
> . . . [W]hile JD intended to conduct a full survey based on his testimony, his survey is lacking. It was able to capture a great number of vehicles, 700, which is clearly in excess of the hundred vehicles required to create an adequate sampling, it did not -- his sampling and his assessment did not utilize other practices that he noted in determining speed assessments.
>
> First, that the assessment is conducted over numerous days to get a sampling of road conditions across a significant portion of time, which is far in excess of the four hours that he was able capture. Additionally, he did not conduct any review of the accident history, evaluate resident input, police input or conduct a pedestrian count of the roadway in question.
>
> As such, the court finds that this information, namely, the speed assessment and the specific opinion as to what a safe speed would be to travel on this roadway is unreliable and irrelevant to the question before the fact finder.

The military judge further noted that JD "assessed the road at a very different time and date, and potential[ ] condition[,] so the court lacks sufficient

---

[6] The four-hour period occurred between 1400 and 1800.

information to make that assessment than those that may have existed at the time of the charged offense." The military judge then granted trial counsel's motion to exclude the speed study from JD's testimony.

While the military judge did not recognize JD as an expert for purposes of the motion, he later amended his ruling to specifically note that he considered JD's testimony "from an expert's point of view." The military judge stated that "even assuming that this witness [JD] were to be recognized by the court as an expert, that that testimony proffered would still be excluded under [Mil. R. Evid.] 702, and as such, [he] would still grant the government's motion to exclude that testimony."

### b. Defense motion to exclude evidence regarding an estimate of Appellant's speed

Trial defense counsel made an oral motion *in limine* to exclude testimony from Dr. IH, a forensic pathologist, regarding his calculation of the speed at which Appellant struck KW. Trial defense counsel argued the testimony on this issue was outside of Dr. IH's qualifications and training and was scientifically unreliable. Trial counsel clarified that Dr. IH's testimony would be focused on the type of injuries he observed on KW, and how those injuries were consistent with a speed "of someone who was hit on the highway or going about 50 miles per hour. . . . [H]e [was] not going to offer the opinion that the vehicle at issue was absolutely traveling 50 miles per hour."

The military judge allowed Dr. IH to testify telephonically for the purpose of the Article 39(a), UCMJ, session. During his testimony, Dr. IH outlined his education and training credentials in the area of forensic pathology. Dr. IH stated during his career, he "personally performed [ ] more than 30,000" autopsies over the course of 35 years. Dr. IH also stated he had been qualified as an expert in forensic pathology at least 2,000 times and had never been found unqualified to testify as an expert in forensic pathology.

Dr. IH further outlined how he evaluated autopsies for individuals who had been struck by vehicles, noting he is frequently called upon to provide his expert opinion about how fast a car was driving based on injuries to pedestrians that were struck by cars. In preparing for Appellant's case, Dr. IH reviewed images of the scene, images of KW's body (including autopsy photographs), the autopsy report, and an accident reconstructionist's assessment conducted by the Pemberton Township Police Department after the accident. Dr. IH opined,

> There's no particular injury that any forensic pathologist can look at, point to, and say that means the person . . . that struck him was going at 55 miles [per] hour or was going 45 miles per hour. It's the combination of injuries and how much destruction is done to solid bone and to hard organs that lets you say it

wasn't 25 miles [per] hour. It had to be at 50 [miles per hour] or closer. And . . . unless it's a really frail, elderly person, you usually don't even see fatalities below 25 miles per hour unless it's an actual overrun by a heavy vehicle. And as you start getting up to 30 [miles per hour] and above you start to see fatalities forming and by the time you get to 50 miles per hour they become the norm and you die more then [sic] you are likely to survive.

Dr. IH testified that he could give a range, but not an accurate speed at which the impact occurred; however, it would be a "normal practice" for him to give a "rough range of what the speed is likely to be based on . . . injuries." Dr. IH was then asked many questions about KW's injuries and how those injuries related to her death. Dr. IH provided details about some of those injuries, many of them graphic.[7] Based on those injuries, he stated, "I would be very surprised to see these kinds of injuries in this kind of decedent at less than 45 miles [per] hour. That would be very unusual." When asked if there were any studies that could confirm or challenge Dr. IH's conclusions, he responded, "I know of no one who would stand up and say that this could have happened at 25 miles [per] hour, but if you can find such a forensic pathologist then obviously you should present them."

In his findings of fact, in addition to noting Dr. IH's credentials, the military judge found as fact that "a pathologist must look at the various injuries sustained in total to determine the force that likely caused the nature and extent of the injuries observed. This results in a pathologist being able to render an opinion only in the form of a range." The military judge also found as fact that,

> Dr. IH reviewed the autopsy report, the autopsy photos, photos of the scene of the accident, images of the body both before and after autopsy, and the accident report to include the accident reconstructionist's speed calculations. Dr. IH has come to form an opinion in this case on the speed of the vehicle which struck and

---

[7] Dr. IH testified,

> So if you've got every rib in your body broken, if you've got a solid thoracic spine that is completely sheared in two, as in this case, along with the aorta next to it, and those rib fractures have been driven into the lungs, if you've got steady open of the major solid organs as indicated here, and if you have cracking of the epidermis across the groin, that's all the kind of things that you're going to see when you get well above 45 and into the 50 mile [per] hour range.

> killed the named victim in this case. His opinion is that the speed of the vehicle was 50 miles per hour or more with a discrepancy of plus or minus 10 miles per hour.[8]

The military judge concluded that Dr. IH's testimony was admissible and provided the following findings pursuant to *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993): (1) Dr. IH could not determine an exact speed estimate, however, speed estimates with a range could be readily identified; (2) the practice of estimating speed has been tested by forensic pathologists, like Dr. IH, as "[t]here are continuing education conferences which conduct reviews of case studies which involve speed as well as the review of numerous cases to identify common injuries and factors in vehicle accidents;" (3) "[n]ot every opinion must be accompanied by a known error rate," and therefore, forensic pathologists can express "an error rate of sorts when expressing . . . speed estimate in the form of an opinion;" (4) that the probative value of Dr. IH's evidence outweighs any unfair prejudice, confusion of issues, or misleading the jury, specifically noting that "the evidence of a speed estimate as determined by the injuries observed in the victim of this case is very relevant to the charged offenses;" and (5) trial defense counsel could cross-examine Dr. IH to "show the limitations of expert opinions, to include the limitations of speed range or calculations made by Dr. IH."

The military judge denied trial defense counsel's motion to exclude testimony of a speed estimate by Dr. IH. Appellant claims the military judge erred in permitting Dr. IH to testify on this issue.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erickson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts was clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

Mil. R. Evid. 702 governs the testimony of expert witnesses in a trial by court-martial. The rule provides:

---

[8] Dr. IH's testified about rates of speed, stating the "best that we can say" in providing how fast someone is driving is by giving a range. In this case, Dr. IH gave an example of "40 plus or minus 10, 50 plus or minus 10, 60 plus or minus 10." Dr. IH did not specifically state Appellant was driving "50 plus or minus 10," however, the military judge reasonably interpreted this range from Dr. IH's testimony.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Military judges serve as gatekeepers "tasked with ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007) (citing *Daubert,* 509 U.S. at 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 150).

The United States Court of Appeals for the Armed Forces (CAAF) has articulated six factors to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria:

(1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Although *Houser* predates the leading Supreme Court decisions in this area—*Daubert* and *Kumho Tire Co.*—*Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Id.* (citations omitted). "[W]hile satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *Sanchez*, 65 M.J. at 149. The military judge's inquiry is "flexible" and "tied to the facts of [the] particular case." *Id.* (internal quotation marks and citations omitted).

### 3. Analysis

#### a. Exclusion of the defense expert's speed study

Appellant alleges the military judge erred in excluding evidence of JD's speed study, on the basis that the study would have provided data about the speed which reasonable, prudent drivers "felt comfortable traveling along

Choctaw Drive." Applying the *Houser* factors to this issue, we focus on the legal relevance and the reliability of the evidence JD proffered and find the military judge did not abuse his discretion in excluding JD's testimony regarding the speed study.

The record supports the military judge's finding that JD's study was unreliable. The study did capture a sampling of 700 cars, and according to JD, he only needed 100. However, the four-hour counting period occurred in the afternoon, not in the early morning, and nearly a year after the accident when traffic conditions may have been different. The study did not indicate how the road conditions at the time of the count compared to the road conditions at the time of the accident. The military judge aptly noted the lack of resident and police inputs on the study this issue.

Finally, trial defense counsel wanted to utilize the study to note what "a reasonable speed limit for that road would be." The military judge found this not to be relevant. We agree. As the Government notes, how fast other motorists were driving is not relevant to whether Appellant "exercised due care under the circumstances" at the time of the accident. As the reliability and relevance of this study was problematic and questionable, we find the military judge did not abuse his discretion in excluding JD's testimony regarding the speed study.

### b. Defense motion to exclude Dr. IH's testimony

Applying the *Houser* factors, *supra*, to this issue, we find the military judge did not abuse his discretion in denying the Defense's motion to exclude testimony from Dr. IH on an estimated range of speed Appellant was traveling. Dr. IH clearly had extensive experience and training in the area of forensic pathology, which supported the reliability of his expert opinion and, as the Government notes, the limitations of his opinions, in that he could not give an exact speed at which Appellant was traveling. Dr. IH was able to establish his opinion based upon his review of the information in this case, specifically photographs of the autopsy, the autopsy report, and the accident reconstruction assessment.

Additionally, Dr. IH's testimony was relevant, in that he was able to provide expert opinion testimony to assist the members in their determination of whether and to what extent Appellant was negligent when he struck KW with his car, the primary element in dispute. Finally, the military judge properly conducted a balancing test under Mil. R. Evid. 403, finding the probative value outweighed its likelihood of causing confusion of the issues, or misleading the members. This court finds he did not abuse his discretion in denying the Defense's motion to exclude Dr. IH's testimony.

11

### B. Legal and Factual Sufficiency

#### 1. Additional Background

During findings, Dr. IH testified that given the severity and number of the injuries sustained by KW, those injuries were not "compatible with the posted speed limit of 25. They are the kind of injuries that I see in this kind of individual who has been struck . . . at 50 miles [per] hour or more." Dr. IH further testified,

> I have no doubt that she died of a combination of multiple injuries, but certain of them, even on their own would have been rapidly fatal. Her head injury likely would have, certainly her ruptured aorta would have, and the combination with all of the others without those two injuries would still have proven rapidly fatal. So she died of multiple injuries.

HA, an expert in meteorology, testified that "civil twilight," the time when "the sun starts to rise in the morning," began at 0502.[9] A year after the accident in July 2019, HA visited the scene of the accident to observe the weather conditions; the temperature was 79 degrees with a dew point of 77 degrees at 0356, compared to a temperature of 71 degrees on the day of the accident.[10] HA stated on the day of his visit, there was light fog when he came to the edge of the bridge, however, it affected his visibility only "[v]ery, very minimally;" otherwise, the "visibility was very good." Specifically, HA stated on the day of his visit, there was no recorded fog, the sky was clear, it was a humid day, and visibility was "maxed out at 10 miles." HA opined on the day he visited the site of the accident, there was a "very . . . similar condition on the date of the accident," and that at the time of the accident, "there might have been a light fog on the windshield, but I still think the visibility was very good." HA concluded that there was no fog present on the day of the accident.

Special Agent (SA) JS, Air Force Office of Special Investigations (AFOSI), testified that on 9 July 2019, he drove and timed the route that Appellant took the morning of the accident. Leaving Appellant's residence at 0500, it took SA JS 21 minutes to drive the route from Appellant's residence to his duty location. In calculating the time, SA JS described driving from Appellant's residence and taking Chippewa Trail out to Spring Terrace to the bridge (where Spring Terrace becomes Choctaw Drive). He explained that the road was

---

[9] HA also testified the humidity was 97 percent, and the moon was "83 percent illuminated."

[10] HA did not note the dew point on the day of the accident; however, according to Special Agent JS, as part of its investigation, Air Force Office of Special Investigations determined the dew point on the day of the accident was 69 degrees.

> [w]ind[ing], it's residential, so it wasn't safe to, you know go from
> 0 to 30 right away. So, I was driving like I would normally drive.
> And, then, eventually, once I could get up to speed, I would leave
> it at 30, but there were several times throughout the route where
> I'd have to drop it down just due to safety.

From Appellant's home to the scene of the accident, driving 30 miles per hour (with some variations for safety), it took SA JS 3 minutes and 29 seconds.

Patrolman SP of the Pemberton Township Police Department responded to the scene of the accident and conducted the initial investigation. Patrolman SP documented the scene and took various measurements. Notable measurements include the following: (1) KW's body traveled approximately 163 feet, 8 inches from when Appellant struck her with his car to where her body came to rest; (2) Appellant's car traveled almost 187 feet after he struck KW before coming to a stop; and (3) once KW's body made contact with the ground after having been struck, her body slid 78 feet along the road until she came to her final rest. Patrolman SP also noted there were no skid marks when Appellant applied his brakes. Patrolman SP stated this was not a surprise, given that Appellant's vehicle was a newer model, equipped with an anti-lock braking system (ABS), which limits skid marks. As Patrolman SP testified, "ABS is designed to bring a wheel to almost a complete stop and then release the brakes and then re-apply the brakes; that's the vibration that you would feel in the brake pedal. . . . ABS will stop a vehicle in a shorter distance." Patrolman SP also testified that the windshield was caved in and there was glass in the seats of Appellant's car.

MD testified as a government expert in crash reconstruction. Based on the movements of KW when she was struck, where her body came to rest, and the trajectory of her body, MD estimated Appellant's speed was 47 to 57 miles per hour at impact. MD also stated that based on Appellant's interview with investigators, as well as the distance analysis of how and where KW's body came to rest, he agreed Appellant "saw at least something before impact" that caused him to start a "trigger perception response" (the amount of time Appellant would have recognized KW to the time that he applied his brakes). MD acknowledged a hypothetical question that if Appellant's windshield had been clear, and if he had been driving 30 miles per hour, he would have had time to see KW and stop without hitting her.

MD acknowledged that KW, as a pedestrian located in a crosswalk, "was in a better position to see" Appellant's vehicle approaching her from "131 feet, all the way to 280" feet, if Appellant had "been traveling the constant 25 miles per hour versus 47 to 57" miles per hour. The reason he gave for this conclusion is that "pedestrians, normally, generally, in most cases because they are not inside a vehicle and they are out in the environment, have a greater ability to

13

appreciate and see things easier." MD stated that it is easier for the pedestrian to recognize the vehicle than for a driver to recognize the person.

The Defense's accident reconstructionist, JD, also testified that it was his opinion that Appellant was traveling 35 to 40 miles per hour when he struck KW. JD also testified that KW had the ability to observe approaching traffic before she moved into the [crosswalk]. Further, JD believed that

> the angle of the roadway with respect to the angle of the cross-walk may have prevented her from making direct visibility unless she looked to her left, and I believe it's because of her inability to hear, because of ear[ ]pods, I believe she was wearing, as well as her lack of looking to the left, she never saw this vehicle, and moved right out into the path of the approaching vehicle.[11]

JD opined that KW moving into the path of Appellant's approaching vehicle was the most significant factor that contributed to KW being struck by Appellant's car, and, further, that it was his opinion,

> [W]hether [Appellant] was traveling at 40 miles [per] hour or 25 miles [per] hour when he was only 60 feet away, one second away, he wouldn't have been able to avoid this collision if the windows were fogged. He wouldn't have been able to. She might have had a little bit more opportunity to get to the other side of the car, but she would have been struck by the left front headlight. And you know, okay, I'll agree that at 25 miles [per] hour, it's likely that you would not have sustained the kind of fatal injuries that she sustained. I mean, the research would show that you can survive at 25. But there's still going to be an impact, so I don't know whether the avoidability of a collision can be shown at either his speed of 35 or 40 or at 25.

### 2. Law

We review issues of legal and factual sufficiency de novo. Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

---

[11] The court notes that headphones were found in Appellant's car, but it was never fully established that the headphones (or ear pods) actually belonged to KW.

found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). The "government is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Appellant was convicted of involuntary manslaughter, in violation of Article 119, UCMJ. In order to convict, the Government was required to prove four elements beyond a reasonable doubt: (1) that KW is dead; (2) that her death resulted from Appellant's act, to wit: striking KW with his passenger car; (3) that the killing of KW was unlawful; and, (4) that Appellant's act constituted culpable negligence. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 44.b.(2). To prove the culpably negligent nature of an act, the Government may, and often must, rely on the additional surrounding circumstances and the manner in which he committed it. It is not necessary that all of the details that together establish that conduct rose to the level of culpable negligence be specifically alleged in a specification. *See generally United States v. Crafter*, 64 M.J. 209 (C.A.A.F. 2006) (addressing the test for the sufficiency of a specification). Instead, the factfinder at trial and this court may consider all of the evidence properly admitted during findings when determining whether Appellant's conduct constitutes culpable negligence.

Culpable negligence is defined as follows:

> Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Thus, the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence of the act or omission.

*See MCM*, pt. IV, ¶ 44.c.(2)(a)(i). "We apply an objective test in determining whether the consequences of an act are foreseeable." *United States v. McDuffie*, 65 M.J. 631, 635 (citing *United States v. Riley*, 58 M.J. 305, 311 (C.A.A.F. 2003); *United States v. Oxendine*, 55 M.J. 323, 326 (C.A.A.F. 2001)). The test for foreseeability is "whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts." *Oxendine*, 55 M.J. at 325 (internal quotation marks and citation omitted).

When considering whether a death resulted from an accused's act, we consider proximate cause. "To be the proximate cause of the victim's death . . . [the] appellant's conduct . . . must only play 'a material role in the victim's decease.'" *United States v. Reveles*, 41 M.J. 388, 394 (C.A.A.F. 1995) (citing *United States v. Lingenfelter*, 30 M.J. 302, 307 (C.M.A. 1990) (quoting *United States v. Cooke*, 18 M.J. 152, 154 (C.M.A. 1984)). Moreover, as the CAAF noted in *Oxendine*,

> Even if one is found "criminally negligent . . . it is possible for negligence of the deceased . . . to intervene between" an accused's "conduct and the fatal result in such a manner as to constitute a superseding cause, completely eliminating the defendant from the field of proximate causation." However, "this is true only in situations in which the second act of negligence looms so large in comparison with the first, that the first is not to be regarded as a substantial factor in the final result."

55 M.J. at 327 (citing *United States v. Cooke*, 18 M.J. 152, 154 (C.M.A. 1984) (quoting R. Perkins, *Criminal Law* 703 (2d ed. 1969)).

Appellant was also convicted, in the alternative, of negligent homicide, in violation of Article 134, UCMJ. *See United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014) (ruling that charging in the alternative is appropriate when "there may be a genuine question as to whether one offense as opposed to another is sustainable" (quoting *United States v. Morton*, 69 M.J. 12, 16 (C.A.A.F. 2010)). In order to convict, the Prosecution was required to prove five elements

beyond a reasonable doubt: (1) that KW is dead; (2) that her death resulted from Appellant's act, to wit: striking KW with his passenger car; (3) that the killing of KW was unlawful; (4) that Appellant's act which caused her death amounted to simple negligence; and (5) that under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *MCM*, pt. IV, para. 85.b. Simple negligence is defined as

> [T]he absence of due care, that is, an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care of the safety of which a reasonably careful person would have exercised under the same or similar circumstances. Simple negligence is a lesser degree of carelessness than culpable negligence.

*MCM*, pt. IV, para. 85.c.(2).

"[E]xceeding the speed limit, . . . standing alone, may show nothing more than simple negligence. . . . Nor may we conclude from the mere occurrence of the accident that it was precipitated by a culpably negligent or wanton operation of the vehicle." *United States v. Lawrence*, 18 C.M.R. 855, 857 (A.F.C.M.R. 1955) (citations omitted). "[S]imply exceeding the speed limit is not culpable negligence." *United States v. Gamble*, 40 C.M.R. 646, 648 (A.C.M.R. 1969).

### 3. Analysis

In his brief before the court, Appellant concedes that the first three elements of involuntary manslaughter and negligent homicide are not in dispute. However, Appellant argues the Government did not prove beyond a reasonable doubt that Appellant's actions were either culpably negligent, or amounted to simple negligence. We disagree.

Importantly, the same day as the accident, Appellant admitted to police that he applied the brakes only after he struck KW in the crosswalk with his car. Consistent with this admission, a factfinder could reasonably infer that Appellant was distracted, and thus failed to maintain a proper lookout as he was driving. Also, a reasonable factfinder could infer from SA JS's testimony about how long it would take Appellant to drive from his residence to the scene of the accident to the duty location, and that Appellant was speeding because he was late for work.

When reviewing for legal sufficiency, we view the evidence in the light most favorable to the Government. The posted speed limit was 25 miles per hour. The Government's accident-reconstruction expert testified that Appellant was driving over 47 to 57 miles per hour, as much as 32 miles per hour over the speed limit when he struck KW on a two-lane residential road. The Government's forensic pathologist opined that, based on the injuries sustained by KW, Appellant was driving 45 to 55 miles per hour. Even Appellant's own expert

estimated Appellant was driving 35 to 40 miles per hour. Thus, it is foreseeable that his unlawful act in driving well over the speed limit in a residential area would result in a fatal collision.

In addition to the speed that Appellant was driving, the evidence suggests Appellant, who appeared to take this route regularly to work, at this particular time, would have been aware of the hazards of coming off the bridge. The bridge contained a slight downward curve, creating an area of decreased visibility. Even Appellant's own expert noted that "the angle of the crosswalk may have prevented [KW] from making direct visibility unless she looked to her left." There were caution signs on the road, including a "BLIND PERSON AREA" sign, and, the road appeared to be designated as a no passing zone based upon signage placed along the side of the road in the direction the accused was traveling.

Excessive speed, coupled with the meteorological and road conditions, establish the foreseeability that, when Appellant struck KW with his car, he was the proximate cause of her death, and that speed alone was not the sole cause of her death. KW may not have being paying attention when she stepped in the crosswalk, but her visibility was enhanced by the neon shirt she was wearing. A reasonable factfinder could conclude that Appellant was driving as fast as 57 miles per hour coming off the bridge and that KW simply did not have time to react if she even saw Appellant's car before he struck her with it. There is nothing about KW's conduct that leads us to believe that her negligence "looms so large" as to disregard Appellant's acts at the moment he struck her with his car in the crosswalk. After reviewing the testimony and photographs of the scene and of KW, we are convinced that her death was not only foreseeable, but a natural and probable result of Appellant's inattentive driving and excessive speed. Further, even if Appellant's view was obstructed by fog or condensation on his windshield, we are not convinced that this was an unforeseen and intervening circumstance that would absolve Appellant of wrongdoing.

Appellant, who stated this was a normal day, who was familiar with this route, on his way to work, at this particular time of day under these particular circumstances, and was driving in an area with a speed limit of 25 miles per hour, culpably disregarded the foreseeable consequences of his actions and created an unjustifiable danger. We are convinced that a reasonable factfinder could have found—as the members did—all the essential elements of involuntary manslaughter beyond a reasonable doubt. In addition, after weighing the evidence in the record of trial and making allowances for not personally observing the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Based on our findings that the Government proved Appellant's culpable negligence beyond a reasonable doubt, we also find Appellant's conviction for negligent homicide, charged in the alternative, legally and factually sufficient.

### III. CONCLUSION

The findings and sentence entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). The findings of guilty to Charge I and its specification, and the sentence, are **AFFIRMED**. The findings of guilty to Charge II and its specification are conditionally **SET ASIDE** and Charge II and its specification are conditionally **DISMISSED** without prejudice to reinstatement should the findings of guilty to Charge I and its specification be set aside on further review before the case becomes final. The dismissal of Charge II and its specification is conditional upon the affirmed findings of guilty as to Charge I and its specification surviving the completion of appellate review. Upon completion of appellate review, The Judge Advocate General will direct an entry of judgment publishing the proceedings of the court-martial as affirmed on appeal. Article 76, UCMJ, 10 U.S.C. § 876; R.C.M. 1111; R.C.M. 1209; Air Force Instruction 51-201, *Administration of Military Justice*, Section 14J (18 Jan. 2019).



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court