# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40092 (f rev)**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Calvin M. COOPER**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 11 January 2023

————————————

*Military Judge:* Rebecca E. Schmidt; Dayle P. Percle (remand).

*Sentence:* Sentence adjudged on 3 February 2021 by GCM convened at Kirtland Air Force Base, New Mexico. Sentence entered by military judge on 31 March 2021: Bad-conduct discharge, confinement for 5 years, forfeiture of all pay and allowances, reduction to E-1.

*For Appellant:* Major Ryan S. Crnkovich, USAF; Major Eshawn R. Rawlley, USAF; Kevin T. Carroll, Esquire; David L. Hall, Esquire.

*For Appellee:* Lieutenant Colonel Amanda L.K. Linares, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge KEY and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Judge:

A panel of officer and enlisted members sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of wanton operation of a passenger vehicle, in violation of Article 113, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 913; one specification of involuntary manslaughter by culpable negligence, in violation of Article 119, UCMJ, 10 U.S.C. § 919; and one specification of negligent homicide, in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] After findings were announced, the military judge dismissed the negligent homicide specification, conditioned on Appellant's conviction of involuntary manslaughter being affirmed upon appellate review. The military judge informed the members at the beginning of the presentencing proceeding, as well as in the sentencing instructions, that they were to sentence Appellant only for the specifications of wanton operation of a passenger vehicle and involuntary manslaughter. The panel sentenced Appellant to a bad-conduct discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant's case is before this court a second time. On 28 April 2022, this court remanded this case and returned the record of trial to the Chief Judge of the Air Force Trial Judiciary for correction under Rule for Courts-Martial (R.C.M.) 1112(d). Specifically, this court noted that the record was missing complete versions of Prosecution Exhibit 9 and Appellate Exhibit LIX. On 13 May 2022, the court reporter and the military judge recertified the record of trial. We find that the military judge has complied with our previous order, and the errors have been corrected.

Appellant's case was re-docketed with this court on 31 May 2022. Appellant now raises eight issues, which we have reordered and reworded: (1) whether Appellant's convictions are legally and factually sufficient; (2) whether the military judge abused her discretion by excluding evidence suggesting the victim's prior conduct contributed to her death; (3) whether the military judge abused her discretion by refusing to compel the convening authority to approve a defense request for its forensic toxicologist to travel to be present during trial; (4) whether the military judge abused her discretion when she denied a defense motion to exclude evidence or dismiss the charges due to the Government's failure to preserve evidence; (5) whether trial counsel committed prosecutorial misconduct during closing and rebuttal arguments; (6) whether trial counsel committed prosecutorial misconduct during sentencing argument; (7) whether Appellant was denied the effective assistance of counsel under the Sixth

---

[1] All references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

Amendment[2] for alleged deficiencies in the performance of his trial defense counsel; and (8) whether Appellant was deprived of his right to a unanimous verdict.

With respect to issues (3), (4), and (8), we have carefully considered these issues and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

On 23 March 2019, Appellant and three fellow Airmen, MT, WR, and RL,[3] decided to see a movie in Albuquerque, New Mexico. The group departed Kirtland Air Force Base (AFB) at around 1930 in Appellant's car—a blue 2002 Subaru Impreza WRX. Appellant was driving, while MT sat in the front passenger seat. WR sat in the right rear passenger seat, while RL sat in the rear seat behind Appellant. Appellant departed the base on Gibson Boulevard and stopped at a red light, at the two-way intersection of Louisiana Boulevard and Gibson Boulevard. At the intersection Appellant had the option of turning left to remain on Gibson Boulevard, or proceeding straight onto Louisiana Boulevard, which runs north-south.

While Appellant was stopped at the intersection, TA, driving a car with his girlfriend AH as a passenger, and traveling east on Gibson Boulevard, turned north onto Louisiana Boulevard. Following immediately behind TA's car was a car driven by FC, in which her husband GC was a passenger. Louisiana Boulevard was under construction at this time and had two lanes of traffic going north and two lanes heading south. Shortly after the Gibson Boulevard intersection, a third lane of traffic heading north on Louisiana Boulevard appeared. This third, far-left lane was a left-turn-only lane which was used to turn left on to Eastern Avenue, the next intersection on Louisiana Boulevard north of the Louisiana Boulevard–Gibson Boulevard intersection. This left-turn-only lane on Louisiana Boulevard became an uncurbed median, painted with diagonal yellow lines, on the north side of the Eastern Avenue intersection.

Once the light at which Appellant was stopped turned green, Appellant continued straight, now heading north on Louisiana Boulevard. He quickly ac-

---

[2] U.S. CONST. amend. VI.

[3] At the time of the incident, MT was MM.

celerated and moved into the far-left, turn-only lane when it opened. WR testified that he told Appellant at this point that they were going to have to get over soon because "this lane is going to end."

AH testified that after TA turned onto Louisiana Boulevard, she saw a woman, AB, standing in the painted median north of the Eastern Avenue intersection. AH noted that AB was wearing a "super bright" pink hoodie. AH testified that AB looked like she was patiently trying to cross the street and that AB's presence in the median did not in any way make her nervous. At trial, AH explained, "I felt like [AB] was on a safe spot, like, she was either on a median or something," adding: "She wasn't in a lane of traffic. She was either on the sidewalk or in the middle of the two directions of traffic." TA also recalled seeing AB crossing the street and testified: "It seemed fine to me. I mean, I passed her and kind of looked and she was waiting for us to pass." TA also testified that he used to live in the area and that it was "pretty common" for pedestrians to cross the road not using the cross-walk. Immediately after they passed AB, TA looked in his side mirror and saw Appellant's "car in the median where [AB] was at overcorrecting and then darting back and towards the sidewalk."

FC testified that after she turned north onto Louisiana Boulevard, the light turned green for Appellant. Appellant was now behind her vehicle and quickly caught up to it. During her testimony, FC estimated that she was driving around 30 miles per hour and that she heard Appellant's "fairly loud" vehicle approaching from behind. She then described how Appellant's car passed her on her left in the left-turn-only lane—the lane that turned into the median on the opposite side of the upcoming intersection with Eastern Avenue. She testified that Appellant's car was accelerating while passing her. FC stated that at the same time as Appellant was passing FC, FC also saw AB standing in the median about 200 yards ahead. She testified about what happened next: "The vehicle passes me in the median. I look straight ahead. I see the car still going in the median. I noticed the person in the median up ahead. The car swerves a bit, mimicking the person, and then it hits the person." FC testified that Appellant was going approximately "50 to 60 miles per hour" when it passed her and struck AB. She also stated that she would have had "[p]lenty of time to stop" if AB had been in front of her.

FC testified that after Appellant's car hit AB, Appellant's car veered in front of hers and hit an apartment building. She described the impact as "significant," and estimated that Appellant's car was still traveling approximately 40 miles per hour when it hit the apartment building.

FC's husband, GC, also testified during Appellant's court-martial. He testified that he was looking at his cell phone and that his wife made a sound that startled him and caused him to look up. GC testified about what he observed:

4

> [B]y the time I looked up, I had already heard a pop and screech-ing of tires, and that's when I looked up and I saw a blue Subaru crossing in front of us at a high rate of speed. And when I heard the pop, I looked up and I could see what I thought was debris flying. I had no idea what it was or what, you know, what -- and they hit the apartment.

GC later testified that the car was "flying past us like twice the speed that we were going." GC also estimated that he and his wife were traveling at "no more than 40 miles an hour."

Also around the same time, Senior Airman (SrA) CS was traveling south on Louisiana Boulevard in the opposite direction as Appellant. He testified that he "noticed a car just slam[med] into the apartment complex to [his] left-hand side." He further stated: "[I]t was a pretty destructive impact. I mean, I knew instantly that it was definitely going to be some injuries, as I took on myself to pull over and try to help." SrA CS estimated that Appellant's car was traveling "upwards of 50" miles per hour when it hit the curb and the apartment build-ing. SrA CS testified that he had driven on Louisiana Boulevard near the loca-tion where AB was hit around 100 times. He stated that it was not unusual to see people crossing the street at that location, describing it as a "highly foot-trafficked area."

CR was inside her apartment, which was near the location of the incident. She testified that she "heard a car accelerating really loud, and then [she] heard a big boom that sounded like an explosion." She also testified that alt-hough it was sundown there was still light outside, noting, "You could see. It wasn't dark or anything." CR also explained the volume of pedestrian traffic in the area during her testimony:

> The bus stop on the west side of the street [Louisiana Boulevard] is directly in front of my apartment, and then there's an actual sheltered bus stop across the street. So there's quite a bit of traf-fic right there: people getting off the bus and people catching the bus.

> And then the veteran's memorial is right there, and a lot of peo-ple take their dogs over and walk around there. And then, of course, we have a volume of homeless.

Another nearby apartment resident, OE, testified that she looked out her window when she heard what she said sounded like two cars racing, specifically hearing "the sound of the engine and them pushing on the gas." She described looking out at the street and seeing "some-thing black fly up into the air." She testified that she soon found out that what she saw flying in the air was the lower half of AB's body. She

then explained that when she went outside, she saw Appellant's blue car was "literally like in the apartment."

MT was riding in Appellant's front seat. She testified that she was on her phone while Appellant was driving up Louisiana Boulevard. She described what happened next:

> I just remember hearing someone say, "You're going to hit her." And then I looked up and I realized what was about to happen, and I closed my eyes. And I just remember hearing the window break and then going over the curb and hitting the apartment complex and then opening my eyes and [AB] was on top of me.

MT also confirmed that Appellant's car was in the median, and acknowledged that Appellant "might have been going a little faster" than the speed limit. RL, a close friend of Appellant who was riding in the backseat of Appellant's car, testified that AB "tried to move out of the way of [Appellant]'s car."

During trial, Dr. LD, a medical examiner, who was recognized as an expert in forensic pathology, testified as to the various catastrophic injuries inflicted on AB as a result of Appellant striking her with his car. Generally, he testified that AB was transected at the midsection as she impacted the roofline of Appellant's vehicle. As he described it, "The only other time I've seen injuries such as these were in relation to a pedestrian hit by a train."

As a result of the crash, all the occupants of Appellant's car suffered injuries. MT suffered fractured ribs. RL suffered a broken rib, lacerated liver and kidney, bruised lungs, and a misaligned patella. WR suffered a fractured sternum and a bruised abdomen. Appellant's injuries included cracked ribs, shoulder damage, pneumothorax in his left lung, a broken jaw and nose, and a cracked skull.

Detective DB of the Albuquerque Police Department was part of a fatal crash team that investigated the crash scene; he was personally on the scene that night. During his testimony, he explained that he observed blue paint chips, matching the color of Appellant's car, on the pavement in the median. He also described seeing human scuff marks in the median, which he explained are left when a human body rubs against the asphalt. Furthermore, he described finding AB's severed left leg and lower torso in the street, and her upper torso, still wearing the pink sweatshirt, in Appellant's car. Detective DB also confirmed during his testimony that the speed limit on Louisiana Boulevard was 35 miles per hour at the time of the incident.

JM, a government witness, was recognized as an expert in the fields of accident reconstruction and injury biomechanics. Based on his review, he estimated that Appellant's car was traveling "approximately 58–68 miles an hour" when it struck AB. JM then discussed a study that showed the average speed

of travel in vehicle-versus-pedestrian crashes involving complete amputation of a limb was 55 miles per hour, and that the speed of a vehicle would have to be higher to generate enough energy to sever a torso. JM also explained that the distance between the point of impact and the traffic light at Louisiana Boulevard and Gibson Boulevard was 922 feet. JM then stated that Appellant's "turbo charged" car could accelerate up to 60 miles per hour in less than 300 feet, giving Appellant plenty of time to reach that speed after being stopped at the previous traffic light. JM testified that if Appellant had been driving 35 miles per hour—the speed limit—he would have been able to come to a complete stop within 50 feet. JM also stated that his estimates were conservative and that Appellant's actual speed could have been higher.

Officer TM of the Albuquerque Police Department testified at Appellant's court-martial. He explained that after the crash, he interviewed Appellant in the hospital and recorded the interview. During his testimony, the Government played a recording of that interview, which had already been admitted as a prosecution exhibit. During the interview, Appellant told Officer TM that AB ran out in front of his car. The Government also presented the testimony of HD, an insurance adjuster for Appellant's insurance company. He testified that he discussed the crash with Appellant during a phone call on 4 April 2019. A recording of that phone call was admitted into evidence and played in court for the members. During the call, Appellant described the crash as follows:

> So I was in the far left lane, we were going. So the light turned green, we were going, we got probably about a block, and I guess--I didn't know at the time, the lane--the far left lane that we were in ends, it turns into a turn lane. So I was driving, I guess I didn't notice that, and we kind of drove--so we drove kind of into the turn lane. A vehicle pulled up next to us, because I guess he thought that we were going to just turn. So, he filled my gap there. And so, at this point I'm in the turn lane, we hit the brakes a little bit, and the person next to us hit the brakes with us, same time as us, like matched us, and then at this point like I'm in the turn lane. I didn't notice anything ahead of me, and I'm looking over my right shoulder since we hit the brakes at the same time, the car left a gap, a gap for us. So I hit the throttle to get back over to the right, and that's all I remember at that point. I woke up in the hospital.

Appellant also told HD that he never saw AB, and that he was traveling about 40 or 45 miles per hour.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

7

On appeal, Appellant contends that his convictions for wanton operation of a passenger vehicle and involuntary manslaughter (Charges I and II, respectively) are legally and factually insufficient.[4] Specifically, with respect to Charge I and its specification, Appellant argues his actions were not wanton. Likewise, for Charge II and its specification, Appellant argues he was not culpably negligent. Appellant requests that we set aside the findings and sentence. We disagree with Appellant's contentions and find that no relief is warranted.

**1. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, the "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying

---

[4] Appellant also contends that his conviction for Charge III, and its specification alleging negligent homicide in violation of Article 134, UCMJ, is both legally and factually insufficient. We do not address this claim given that Charge III was dismissed conditioned on affirmance of Charge II.

'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of wanton operation of a vehicle in violation of Article 113, UCMJ, which required the Government to prove three elements beyond a reasonable doubt: (1) that Appellant was operating a passenger vehicle; (2) that Appellant operated the vehicle in a wanton manner by driving in the center median and at excessive speeds; and (3) that Appellant caused the vehicle to crash and injure WR, MT and RL. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 51.b.

"Wanton includes 'reckless,' but in describing the operation or physical control of a vehicle . . . wanton may, in a proper case, connote willfulness, or a disregard of probable consequences, and thus describe a more aggravated offense." *MCM*, pt. IV, ¶ 51.c.(8). The operation of a vehicle is reckless "when it exhibits a culpable disregard of foreseeable consequences to others from the act or omission involved." *See MCM*, pt. IV, ¶ 51.c.(7). Recklessness is determined by considering all the circumstances regarding whether an appellant's operation of a vehicle "was of that heedless nature which made it actually or imminently dangerous to the occupants, or to the rights or safety of others." *See id.*

Appellant was also convicted of involuntary manslaughter by culpable negligence in violation of Article 119, UCMJ, which required the Government to prove four elements beyond a reasonable doubt: (1) that AB is dead; (2) that AB's death resulted from an act or omission of Appellant; (3) that the killing was unlawful; and (4) that the act or omission constituted culpable negligence. *See MCM*, ¶ pt. IV, 57.b.(2). Culpable negligence is defined as follows:

> Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Thus, the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when

9

viewed in the light of human experience, might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence of the act or omission.

*MCM*, pt. IV, ¶ 57.c.(2)(a)(i).

To prove the culpably negligent nature of an act, the Government may, and often must, rely on the additional surrounding circumstances and the manner in which a person committed the act. It is not necessary that all the details that together establish the conduct that rose to the level of culpable negligence be specifically alleged in a specification. *See generally United States v. Crafter*, 64 M.J. 209 (C.A.A.F. 2006) (addressing the test for the sufficiency of a specification). Instead, the factfinder at trial and this court may consider all of the evidence properly admitted during findings when determining whether Appellant's conduct constitutes culpable negligence.

"We apply an objective test in determining whether the consequences of an act are foreseeable." *United States v. McDuffie*, 65 M.J. 631, 635 (C.A.A.F. 2007) (first citing *United States v. Riley*, 58 M.J. 305, 311 (C.A.A.F. 2003); and then citing *United States v. Oxendine*, 55 M.J. 323, 326 (C.A.A.F. 2001)). The test for foreseeability is "whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts." *Oxendine*, 55 M.J. at 325 (internal quotation marks and citation omitted).

When considering whether a death resulted from an accused's act, we consider proximate cause. "To be the proximate cause of the victim's death . . . [the] appellant's conduct . . . must only play 'a material role in the victim's decease.'" *United States v. Reveles*, 41 M.J. 388, 394 (C.A.A.F. 1995) (quoting *United States v. Lingenfelter*, 30 M.J. 302, 307 (C.M.A. 1990)). Moreover, as the United States Court of Appeals for the Armed Forces (CAAF) noted in *Oxendine*, "[e]ven if one is found 'criminally negligent . . . it is possible for negligence of the deceased . . . to intervene between' an accused's 'conduct and the fatal result in such a manner as to constitute a superseding cause, completely eliminating the defendant from the field of proximate causation.'" 55 M.J. at 327 (omissions in original) (quoting *United States v. Cooke*, 18 M.J. 152, 154 (C.M.A. 1984)). However, "this is true only in situations in which the second act of negligence looms so large in comparison with the first, that the first is not to be regarded as a substantial factor in the final result." *Id.* at 327 (quoting *Cooke*, 18 M.J. at 154).

### 2. Analysis

Appellant's main contention on appeal is that the evidence was insufficient to prove beyond a reasonable doubt that he drove his car in either a wanton or

culpably negligent manner. We disagree, and find that the Government introduced convincing evidence of Appellant's guilt. First, there is no question that Appellant was physically operating his vehicle and that all three of his passengers were injured in the crash. Additionally, there is no dispute that AB was killed and that her death resulted from Appellant striking her with his vehicle.

Specifically, addressing Appellant's contentions that evidence was insufficient to prove that he was operating his vehicle in a wanton or culpably negligent manner, we find that there was sufficient evidence presented for a rational factfinder to conclude Appellant was guilty of the charged offenses beyond a reasonable doubt. First, the Government established that Appellant was aware of the traffic pattern, in an area that was under construction which would cause a reasonable driver to exercise caution. Second, the evidence also showed that Appellant was aware that the lane he was traveling in would end and that he would need to merge to the right. In fact, the evidence demonstrates that he became aware of this information shortly after he drove through the intersection of Louisiana Boulevard and Gibson Boulevard. Specifically, Appellant's own friend, RL, testified that he told Appellant: "Okay. We're going to need to get over here soon. This lane is going to end." This information provided Appellant with ample time to reasonably plan his safe merger to the right into another northbound lane, turn left onto Eastern Avenue, or stop his vehicle before striking AB.

The evidence presented by the Government showed that Appellant made the opposite decision—a deliberate decision to accelerate and drive well above the speed limit, and continue straight in a left-turn-only lane, in an attempt to merge ahead of the car traveling next to him. He also made the decision to continue this course of action after entering a well-marked median, and continued to drive approximately 200 feet into the median before striking AB. Multiple eyewitnesses testified to the excessive speed at which Appellant was traveling. Additionally, expert testimony offered by the Government indicated that Appellant was traveling 23 to 33 miles per hour above the speed limit when he struck AB with his vehicle. The fact that Appellant knew of the traffic pattern and drove at excessive speeds in a turn lane, and then into a painted median in an effort to pass another car instead of choosing any number of reasonable and safer options, provided sufficient evidence for a trier of fact to conclude that Appellant acted in both a wanton and culpably negligent manner.

Appellant argues now, as he did at trial, that evidence concerning the estimated speed he was traveling was not consistent and was therefore unreliable. We disagree. Multiple unbiased witnesses provided first-hand accounts that Appellant was traveling well above the speed limit, and other witnesses testified that they could hear Appellant's car accelerate from inside their apartment buildings. Finally, an accident reconstructionist provided expert testimony

opining that Appellant was traveling more than 20 miles per hour above the posted speed limit. We are not persuaded that minor inconsistencies in witness testimony about the speed Appellant was traveling establishes reasonable doubt. Moreover, Appellant's speed was not the only evidence of Appellant's negligence; he executed a passing maneuver while in a turn lane as he approached an intersection in such a reckless manner that he continued driving into a painted median for at least 200 feet. Additionally, we find that Appellant's conflicting statements to law enforcement and insurance professionals—from AB jumping in front of him to him not seeing AB at all—provide some indication that Appellant was trying to cover up his culpability and provide some evidence of his consciousness of guilt.

We conclude that viewing the evidence introduced at trial in the light most favorable to the Prosecution demonstrates a rational trier of fact could have found the essential elements of the crimes of wanton operation of a vehicle and involuntary manslaughter by culpable negligence beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41.

## B. Evidence of AB's Prior Conduct

Appellant argues that the military judge abused her discretion by excluding evidence related to AB's prior substance abuse, suicide attempts, and a social media post in which AB expressed thoughts that sobriety was challenging and that she generally felt bad about herself. Specifically, Appellant argues that the military judge applied the wrong legal test and reached the wrong conclusion; and that the proffered evidence was admissible in findings to establish AB's contributory negligence and thus lessen Appellant's culpability. Appellant asks that we set aside the findings and sentence. We find that the military judge did not abuse her discretion and that no relief is warranted.

### 1. Additional Background

At trial, the Government sought to exclude evidence relating to AB's past drug use, suicide attempts, and a Facebook post she made on the day of the accident. Specifically, Appellant sought to admit certain intake records from AB's treatment at a residential rehabilitation treatment facility in New Mexico. These records discussed AB's struggles with alcohol and drugs, as well as her general mental health. Meanwhile, the Facebook post read:

> [W]ell today is very hard I don't like this up and down s[**]t my moods they suck I want my kids and its so f[**]king hard to be sober and think about all the bull s[**]t ive done to me to my kids to a lot of people im a bad person how dose sober people get

> thourth the pain I cant stand myself right now please GOD
> HELP ME get over this hill of dislikeing myself…..

Appellant argued at trial and argues again on appeal that this evidence was suggestive that AB was intoxicated, was struggling with sobriety and life in general, and was suicidal at the time of her death.

During the motions hearing, FC testified that as she drove north on Louisiana Boulevard, she noticed AB at about 200 yards away standing still in the median. Noting that Appellant's car was in the median when he passed her, FC also stated that AB attempted to move out of the way of Appellant's car, which FC estimated was traveling at 55 to 60 miles per hour. FC also testified that AB was not acting erratically. FC further stated that AB was never in a lane of traffic and did not jump out in front of Appellant's car, and that it did not look like AB was trying to end her own life.

SC, a licensed clinical social worker at the treatment facility where AB had received treatment, also testified at the hearing about the intake she conducted with AB on 18 March 2019—six days before AB was killed. SC testified that the interview took approximately 90 minutes, and that following the interview that she diagnosed AB with Post-Traumatic Stress Disorder, alcohol abuse disorder, and stimulant use disorder. She also noted the diagnosis included three years of chronic alcohol abuse. SC stated that AB had not used drugs or alcohol for nine days prior to the interview. SC also testified that AB was eager to receive help, was there voluntarily, and was cooperative, adding that AB was looking for support and moving on from her addictions. Finally, SC explained that AB did tell her about two prior suicide attempts, that each of those attempts were through pill ingestion and nonviolent, and that AB denied any suicidal ideations at the time of her intake.

MB, a community support worker at the same treatment facility, testified that she had daily contact with AB from 18 March 2019 until AB's death on 23 March 2019. MB stated that AB took her recovery seriously, was involved in meetings, and was doing what she needed to get better. She testified that on 23 March 2019, AB was excited because "[s]he was going to be seeing her kids the next day, she was in a good place." MB also stated that AB was really happy that she was sober and had a good outlook on the future. MB stated that she last saw AB at 1800 hours as AB was heading out with a group for a narcotics anonymous meeting. She stated that AB showed no signs of drinking or drug use that day and that she had no concerns that AB was suicidal. MB also acknowledged that sometimes AB got upset after sharing at the meetings, and that one of her coping mechanisms was walking. She also explained that crossing Louisiana Boulevard was an appropriate way for AB to go from the church where the meeting was held back to the residential facility, testifying, "[I]t seems to me she was going home."

Detective DB of the Albuquerque Police Department testified during the motions hearing that he noticed a moderate smell of alcohol inside Appellant's vehicle after the crash, adding the smell was "[n]ot overwhelming."

As part of her ruling, the military judge made nearly five pages of findings of fact. In addition to incorporating much of the testimony described above, the military judge also found as fact that: (1) RL stated that Appellant's car struck AB in the median; (2) MT witnessed AB in the median and stated that AB tried to avoid Appellant's car; (3) AH saw AB standing in the median; (4) TB was with AB for the 25-minute walk to the meeting and a portion of the meeting, and did not perceive AB to be under the influence of drugs or alcohol; (5) no controlled substances or paraphernalia were found with AB's personal effects after her death; and (6) RL told another Airman that he and the two other passengers in Appellant's car had been drinking alcohol that evening.

In her written ruling, the military judge excluded the evidence finding that the proposed relevance of the proffered evidence was "clearly propensity," as it was being offered by Appellant to show that AB had a history of consuming alcohol and other narcotics, and, thus, that it was likely she was intoxicated on the day she died. Similarly, the military judge also concluded that evidence of AB's earlier suicide attempts was also propensity evidence, given that it was being offered to suggest that because AB had attempted suicide on two prior occasions, she was likely to have committed suicide on 23 March 2019. The military judge then discussed the legal standards, stating that "[t]he requirements for logical and legal relevance also align with the second and third prongs of the *Reynolds*[5] test, as well as basic admissibility under [Mil. R. Evid.] 401 and [Mil. R. Evid.] 403." The military judge then analyzed the evidence under those standards.

First, the military judge found that the evidence was not logically relevant because of the lack of any probative nexus between the records and social media post and issues of contributory negligence, causation, or any other matter of consequence to Appellant's court-martial. The military judge determined that the temporal connection between the events of 23 March 2019 and the proposed evidence of AB's prior substance abuse, previous suicide attempts, and general mental health was too remote and did not make any fact of consequence more or less probable. The military judge further noted that the lack of any evidence suggesting that AB had relapsed in sobriety or mental health on

---

[5] *United States v. Reynolds*, 29 M.J. 105 (C.M.A. 1989). The second and third prongs of the *Reynolds* test are: (1) "What fact . . . of consequence is more or less probable by the existence of the evidence?" and (2) "Is the probative value . . . substantially outweighed by the danger of unfair prejudice?" *Id.* at 109 (omissions in original) (internal quotation marks and citations omitted).

14

23 March 2019, and the other evidence presented during the hearing indicating that AB was sober, actively engaged in treatment programs, committed to her sobriety, and hopeful about her future, supported these findings.

Second, concerning the issue of legal relevance, the military judge found that the probative value of the evidence was "negligible" and was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and waste of time. As to the probative value of the evidence, the military judge determined that AB's actions on 23 March 2019 were the best evidence on the question of whether she was wholly or partially responsible for her death, not speculation regarding whether she was somehow impaired or suicidal at the time of her death. As to the question of unfair prejudice, the military judge noted her concern that the proffered evidence might mislead the members to the "wholly impermissible purpose" of concluding that because AB had a history of substance abuse, suicidal ideations, and mental health issues, that she had poor character and contributed to her own death. The military judge also noted that this risk was more concerning considering the social stigma of the conduct in question and the tendency for this character evidence to lead the factfinder to reach decisions on an improper basis and otherwise confuse the issues.

### 2. Law

We review a military judge's decision to exclude evidence for abuse of discretion. *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004) (citation omitted). An abuse of discretion occurs when the findings of fact are clearly erroneous or the conclusions of law are based on an erroneous view of the law. *United States v. Hollis*, 57 M.J. 74, 79 (C.A.A.F. 2002) (citation omitted). We thus review findings of fact under the clearly erroneous standard and conclusions of law de novo. *United States v. Cote*, 72 M.J. 41, 44 (C.A.A.F. 2013) (citation omitted).

"The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)). "[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and [a military judge's decision] will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted).

If proffered evidence has any tendency to make a fact of consequence more or less probable, then the evidence is relevant. Mil. R. Evid. 401. Absent a rule requiring otherwise, relevant evidence is admissible. Mil. R. Evid. 402. Even when evidence is relevant, a military judge may prohibit its admission when

the evidence's probative value is substantially outweighed by such considerations as the dangers of unfair prejudice, confusing the issues, and wasting time. Mil. R. Evid. 403. Military judges have "wide discretion" in applying the Mil. R. Evid. 403 balancing test; however, military judges are afforded less deference when they do not explain their analysis on the record, and we give them no deference when they do not conduct the analysis at all. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

Mil. R. Evid. 404(b)(1) provides that evidence of a crime, wrong, or other act by a person is not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion and cannot be used to show predisposition toward crime or criminal character. However, such evidence may be admissible for another purpose, including to show, *inter alia*, motive, intent, plan, absence of mistake, or lack of accident. Mil. R. Evid. 404(b)(2); *United States v. Staton*, 69 M.J. 228, 230 (C.A.A.F. 2010) (citation omitted). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989).

On the question of admissibility of an appellant's uncharged misconduct under Mil. R. Evid. 404(b), we use the following three-part test: (1) Does the evidence reasonably support a finding by the factfinder that the appellant committed other crimes, wrongs, or acts? (2) Does the evidence of the other act make a fact of consequence to the instant offense more or less probable? (3) Is the probative value of the evidence of the other act substantially outweighed by the danger of unfair prejudice under Mil. R. Evid. 403? *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). "If the evidence fails to meet any one of these three standards, it is inadmissible." *Id.*

"[T]he Constitution does not confer upon an accused the right to present any and all types of evidence at trial, but only that evidence which is legally and logically relevant." *United States v. Dimberio*, 56 M.J. 20, 24 (C.A.A.F. 2001) (citation omitted).

**3. Analysis**

We begin our analysis by noting that neither party disputes the military judge's findings of fact, and we find that the military judge's findings of fact are supported by the record and are not clearly erroneous. Turning our attention to the question of whether the military judge's conclusions of law were based on an erroneous view of the law, we find the military judge's conclusions of law were not arbitrary, fanciful, clearly unreasonable, or clearly erroneous, and were based on an accurate view of the law.

Appellant argues on appeal that the military judge incorrectly analyzed the proffered evidence through the lens of Mil. R. of Evid. 404 and the *Reynolds*

test, and that she should have "[s]imply appl[ied] Mil. R. Evid. 401 and 403." Appellant correctly notes that the *Reynolds* test applies to the question of the admissibility of an accused's uncharged misconduct, whereas the question here pertains to evidence of the victim's character. However, Appellant has failed to explain why the second and third prongs of the *Reynolds* test should not be applied here or how foregoing that test would somehow yield a different result. Our review of the military judge's ruling supports the conclusion that the military judge used the correct framework. In her written ruling, the military judge discussed the framework for her analysis, beginning with Appellant's constitutional right to present evidence in his defense as long as the proffered evidence was both legally and logically relevant. The military judge then explained that the concepts of legal and logical relevance aligned with the second and third prongs of the *Reynolds* test as well as basic principles of admissibility under Mil. R. Evid. 401 and Mil. R. Evid. 403. Indeed, the second and third prongs of the *Reynolds* test are essentially restatements of Mil. R. Evid. 401 and Mil. R. Evid. 403, respectively. The first prong simply requires the proponent to offer some evidence that the alleged prior acts actually occurred. We see nothing in the military judge's ruling suggesting that she only analyzed the evidence through the lens of Mil. R. Evid. 404. The military judge in this case clearly found that the proffered evidence was not legally or logically relevant and therefore was not admissible under Mil. R. Evid. 401, Mil. R. Evid. 403, or Mil. R. Evid. 404.

The military judge specifically concluded that AB's inpatient records and Facebook post were not logically relevant due to the lack of any nexus between the proffered evidence and issues of contributory negligence, causation, or any other matter of consequence. The military judge further concluded that any probative value of the proffered evidence was minimal and was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and waste of time. The military judge's conclusions were supported by her findings that no evidence was presented during the motions hearing showing that AB used drugs or alcohol after 8 March 2019, and that AB had not contemplated suicide for months prior to 8 March 2019. While the military judge did recognize the possible relevancy of evidence that AB had potentially relapsed, she spent considerable time detailing the dearth of evidence supporting such a relapse, and the fact that the evidence demonstrated that the exact opposite was true.

Appellant argues that Detective DB's testimony that he—as Appellant characterizes—"detected a strong odor of alcohol" coming from Appellant's car

where AB's torso lay, supports his contention that AB had relapsed.[6] However, the military judge addressed this argument in her ruling and noted the lack of any evidence that AB drank alcohol after 8 March 2019, and the fact that the three passengers in Appellant's vehicle had all consumed alcoholic beverages before leaving base in Appellant's car. We find these facts also support the military judge's conclusion that the evidence was not legally or logically relevant.

Appellant now contends on appeal that this evidence was also relevant and admissible as extenuating circumstances and mitigating Appellant's criminal conduct during presentencing proceedings. However, we note that Appellant's motion at trial was only focused on presenting this evidence during findings. Additionally, the military judge's ruling on this evidence clearly stated that she would consider reopening her ruling throughout trial; however, trial defense counsel never requested to reopen the ruling to discuss the possible admissibility of this evidence during presentencing proceedings. Thus, we lack any developed record on the possible use of this evidence during the presentencing phase of Appellant's court-martial. We decline Appellant's attempt to link this possible use of the evidence with the potential uses for which it was offered at trial and the military judge's ruling that was based on those proffered uses.

We conclude that the military judge did not abuse her discretion in excluding the proffered evidence in this case. The military judge's findings of fact were supported by the record and therefore were not clearly erroneous. Furthermore, we find the military judge applied the correct law and placed her findings and conclusions in writing. Finally, recognizing that the military judge had a range of choices, we find her decision to exclude the proffered evidence within that range and therefore not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *White*, 69 M.J. at 239.

## C. Trial Counsel's Closing and Rebuttal Argument

Appellant argues that several comments made by trial counsel during her closing and rebuttal argument constituted improper argument and prosecutorial misconduct. Specifically, Appellant contends that trial counsel made improper comments that "fell outside the bounds of fair comment on the evidence." We disagree and find no error with trial counsel's argument, and therefore no relief is warranted.

### 1. Additional Background

---

[6] The court notes that Detective DB's testimony was specifically that the odor of alcohol was "moderate" and "[n]ot overwhelming."

In the closing moments of trial counsel's 50-minute argument, trial counsel addressed some of the arguments posed by Appellant throughout trial. Trial counsel began this portion of her argument:

> And the problem is [Appellant] instead of taking any fault wants you to believe this is everybody's fault, but his own. He was the one who wasn't let in by the SUV driving straight in a lane. He was stuck. Defense has said it, they've implied it, and they mapped it. He was stuck. But what is being stuck? Stuck is not having options. Stuck is not having good options. Stuck is being left no choice in your own fate. [Appellant] was not stuck. He had options. He could've turned left -- he could have slowed down, he could've come to a full stop. And not only were these all options he had, they were good options. They were smart, reasonable, and safe. He controlled his own fate in those moments. He was behind the wheel of a 3000 pound vehicle with his hands on the wheel, his foot on the gas, and he had the power. You know who was stuck? [AB] was stuck. She was standing in a place that she reasonably expected to be safe. A place a car would not enter, but when [Appellant's] car entered that median[,] breaking rule[ ] after rule of the road, she was stuck. She had no good options. Running into traffic in front of her, run into traffic behind her, standstill, and what's worse because [Appellant] had control of the car, the wheel, the gas, and the [brake]; she had but split seconds to weigh her options and realize that not one of them was good. Her fate was not in her own hands at the moment. It was in the hands of [Appellant].

> It is important to note that with every additional bit of pressure [Appellant] applied [to] that gas pedal he took [AB]'s life more into his own hands. Every mile an hour his car climbed in speed he took more and more options away from [AB]. [JM] did the calculation for you from the beginning of the turn by to where [AB] was struck 455 feet. The bottom of this table is that of miles per an hour, the left side is the seconds it would [take Appellant] to travel that distance. See how that time dives down and down. And as it does the power shifts more and more to [Appellant]. *[Appellant] believed his own victimhood from his interview with [HD]. He says he was the one who is physically hurt. When he was asked if there's injuries to his passengers, he says he's the one that got hurt the worst.*[7]

---

[7] Appellant contends the italicized language amounts to improper argument.

(Emphasis added). Trial counsel then played a portion of Appellant's recorded interview with HD, which was admitted during trial as a prosecution exhibit. In the interview, Appellant tells HD, "I was the one who got hurt the worst." After playing a portion of the interview trial counsel argued:

> *He wants to list all the broken bones he had without a mention of the woman whose femur, ribs, spine, and arms he broke. As he spent three days in [the] hospital, her unidentified body was laying at [the Office of the Medical Investigator]. And his display of victimhood is furthered as his version of the crash evolves.*

(Emphasis added).

Trial counsel then played a portion of Appellant's interview with Officer TM, which had been admitted as a prosecution exhibit at trial. In that interview, Appellant told Officer TM that "[AB] ran in front of us." Trial counsel then played another portion of the interview with HD—which took place chronologically after the interview with Officer TM—in which Appellant told HD that he never saw AB. Trial Counsel then argued:

> And then he never saw her at all. His story adapts and changes because he knows it has to. He's trying to come up with something better. *The less he sees, the less he knows, the further he distances himself from the horror of what he did. Quite frankly, it's understandable, but the option of denying what he's done is no longer available to him.* [AB] crossed the street, she jaywalked. That is not punishable by death. Not if [Appellant] is paying attention, not if [Appellant] is driving a reasonable speed, and not if [Appellant] doesn't drive into the median, but he does all of those things and he took a life and that life mattered. Find him guilty.

(Emphasis added).

During closing argument, trial defense counsel focused the members' attention on the actions of AB and FC, the woman driving the car which Appellant passed. Trial defense counsel characterized FC as "being vindictive" and "spiteful" for not braking and allowing Appellant to merge left in front of her vehicle, and argued that FC was partially responsible for causing the accident. Trial defense counsel then argued that AB "put herself in a position that made it impossible for [Appellant] to avoid." Trial defense counsel next argued that Appellant was "forced into a median" and that it was "impossible" for him to avoid AB.

During her rebuttal argument trial counsel responded to these arguments:

*The last hour is a demonstration of how firmly convinced the defense and [Appellant] are of his victimhood. They have tried to lay this at the feet of [FC and GC]. They even went so far as to say that [AB] flew through that window and smashed [Appellant] in the face breaking his skull. He was driving a vehicle that smashed into her. How and when was she in control of where and how her head flew through the windshield? This firm belief in [Appellant]'s victimhood shades every single argument you heard from the defense counsel.* I spent an hour going through facts with you. My opinion doesn't matter. In one regard the defense is correct, the facts do. So let's talk about some of those reported facts you heard from the defense counsel. And let's do so coolly and rationally.

Because the [G]overnment for not for one minute has called this accused a monster or menace to society. The conduct that we had described that you've heard about isn't one of the monster. Nobody is saying [Appellant] wished [AB] dead, but that doesn't make her less so. And she is because of the willful acts of [Appellant] that had a foreseeable result. First let's talk about this notion that [Appellant] was stuck. Let me out of here, I don't want to be in this median. I have my blinker on, let me out. Is that how driving works? [Appellant] -- the defense counsel framed it as if he was stopped. Just sitting there waiting and then I guess a pedestrian jumped out in front of him and here we are. We know those are not the facts. The reason that this was a split-second decision as a defense counsel framed it is because of the speed [Appellant] was traveling. Remember the chart. The slower he goes the more time he has to react. He created this situation. The lines on the road did not create this situation. [FC] was driving straight in a lane and if you want to believe [Detective DB] that at some point she changed lanes or was trying to. All she did -- all she did was try to get out of [Appellant]'s way then.

If you want to believe that she has something to gain in this process[, t]hat she [has] a dog in this fight, what is it? Why? She was driving straight in a lane. So as the defense counsel said after -- asked her on cross, "Well you were worried somebody got your license plate." And would have done what with it? Called the police and said this lady was driving straight in a lane and then maybe she merged to the right? She came here to tell you about what happened and if anybody has been accused of being

vindictive and spiteful, a monster, it was her and for what? Driving straight in a lane. [Appellant] did not end up in that median. *The language that the defense counsel is using is to make you think that this is something that happened to him and is not. Even little things like if you hear the accused in the [insurance interview] say, "[W]e were driving." "We were driving on Louisiana," this was a group effort. He was driving. He should've said, "I was driving." From this the second this happens he's deferring blame out to those around him. And it's -- it's very intentional.* And it tells us something. It tells us he understands the culpability of his conduct. That he wants to spread it around.

(Emphasis added).

Near the end of trial counsel's rebuttal argument, she argued:

[AB]'s life ended in that split second. The split-second created by [Appellant]'s speed, inattention, and driving in the median. [Appellant]'s life changed in the second as well, but that doesn't mean he is not responsible for it. *Don't let the specter of victimhood cloud what actually happened in this case.* The details are horrific, but focus on the facts.

(Emphasis added).

Defense counsel did not object to the above-referenced portions of trial counsel's closing and rebuttal argument.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)).

"Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006) (citation omitted).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). Prosecutorial misconduct occurs when trial counsel "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). Such conduct "can be generally defined

as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

Counsel are to limit arguments to evidence in the record and reasonable inferences that can be drawn from that evidence. *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). While a trial counsel "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Fletcher*, 62 M.J. at 179 (quoting *Berger*, 295 U.S. at 88).

"[I]t is error for trial counsel to make arguments that 'unduly . . . inflame the passions or prejudices of the court members.'" *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (omission in original) (quoting *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983)). Trial counsel are also prohibited from injecting into argument irrelevant matters, such as facts not in evidence or personal opinions about the truth or falsity of testimony or evidence. *See id.* at 58; *Fletcher*, 62 M.J. at 179; R.C.M. 919(b), Discussion. Courts have struggled to draw the "exceedingly fine line which distinguishes permissible advocacy from improper excess." *Fletcher*, 62 M.J. at 183 (quoting *United States v. White*, 486 F.2d 204, 207 (2d Cir. 1973)).

"[A]rgument by a trial counsel must be viewed within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *Baer*, 53 M.J. at 238 (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)). "[I]t is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Id.*

### 3. Analysis

Since trial defense counsel did not object to the portions of argument that Appellant claims constitute prosecutorial misconduct, we review trial counsel's closing and rebuttal arguments for plain error. Appellant mainly takes issue with trial counsel's characterizations regarding Appellant's perceived "victimhood." Specifically, Appellant argues that trial counsel improperly commented on his right to plead not guilty by inviting the members to find Appellant guilty because he had not sufficiently acknowledged the alleged harm he had caused others. Additionally, Appellant contends that trial counsel's argument invited the members to hold against him fair arguments by his counsel. We are not persuaded by any of these contentions.

Appellant's contention that trial counsel's invocation of "victimhood" was improper rings hollow in the face of the Defense's attempts at trial and during

argument to shift the members' focus from Appellant's actions to those of others involved—namely, AB and FC. It is clear from our review of the record that the Defense was attempting to paint AB and FC's actions as negligent, and thus downplay Appellant's role in AB's death. It is well-settled law under the invited response doctrine that the Government is not prohibited "from offering a comment that provides a fair response to claims made by the defense" in argument. *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citations omitted). We take no issue with trial defense counsel's strategy. The Defense was entitled to—and did—focus the members' attention on the actions of AB and FC. Trial counsel was similarly entitled to refute the Defense's theory by asserting that the Defense was trying to distract the members' attention away from Appellant by blaming AB and FC. Likewise, trial counsel was also entitled to comment on Appellant's statements to HD and Officer TM and argue any reasonable inferences from that evidence. We do not see any argument from trial counsel that improperly commented on Appellant's right to plead not guilty. We find this unobjected-to argument by trial counsel was a fair response and appropriate commentary on the Defense's theory of the case and does not amount to error, plain or otherwise.

## D. Trial Counsel's Sentencing Argument

Appellant contends that trial counsel committed prosecutorial misconduct during sentencing argument by improperly suggesting the opinions from members of Appellant's unit and the opinion from Appellant's commander's regarding Appellant's good military character contained minimal value because those individuals presumed his innocence prior to his conviction. Appellant asks this court to significantly reduce his confinement sentence or, in the alternative, set aside his punitive discharge. We find no error and that no relief is warranted.

### 1. Additional Background

During presentencing proceedings, the Defense called Appellant's commander, Lieutenant Colonel (Lt Col) SR. Lt Col SR testified regarding Appellant's "[e]xemplary" duty performance and his "high" rehabilitation potential. During his testimony, Lt Col SR referred to events that were the subject of the Appellant's conviction as an "accident" and stated that Appellant "made a mistake with tragic consequences." On cross-examination Lt Col SR acknowledged that it was difficult for him to prefer charges against Appellant and agreed that Appellant's unit rallied around him since the accident. When asked by trial counsel if he still believed it was an accident, Lt Col SR confirmed that he did, but added that he "accept[ed] what the jury found."

In addition to the above testimony, the Defense also offered 29 character letters attesting to Appellant's strong military character and high rehabilitation potential.

During sentencing argument, trial counsel stated:

> Members, the maximum confinement available to you is 11 1/2 years. Compare that with the actions of [Appellant] cutting short 20, 30, 40 years of [AB]'s life. And to start with there are some mitigating circumstances that might not make a full 11 1/2 years not [sic] appropriate in this case. [Appellant's] character letters. And ultimately, those around him and their opinions tell us a little bit about [Appellant]'s history. I'm sure you'll go back and you'll read those letters and take them into account. But let's be clear, members, a good upbringing and good family, and a unit that decided right away to rally around this [A]irman and really *blindly just assume his innocence*, even in the face of a conviction does not right his wrong. It doesn't it make somehow less. It makes it truly tragic to those around him, to his family and to those people who care about him. And it makes around -- those around him sad because he's a good looking young [A]irman and has his whole life ahead of him.

(Emphasis added).

Again, defense counsel did not object to the above-referenced portions of trial counsel's sentencing argument.

### 2. Law

The issue of "[i]mproper argument is a question of law that we review de novo." *United States v. Marsh*, 70 M.J. 101, 104 (C.A.A.F. 2011) (citation omitted). However, if the defense does not object to a sentencing argument by trial counsel, we review the issue for plain error. *Id.* (citing *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007)). To establish plain error, an appellant "must prove the existence of error, that the error was plain or obvious, and that the error resulted in material prejudice to a substantial right." *Id.* at 106 (citing *Erickson*, 65 M.J. at 223). Because "all three prongs must be satisfied in order to find plain error, the failure to establish any one of the prongs is fatal to a plain error claim." *Bungert*, 62 M.J. at 348. The burden of proof under a plain error review is on the appellant. *See id.* (citation omitted).

"The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (quoting *Baer*, 53 M.J. at 237). Three factors guide our determination of the prejudicial effect of improper argument: "(1) the severity of the misconduct, (2) the measures

adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction[s]." *Sewell*, 76 M.J. at 18 (alteration in original) (quoting *Fletcher*, 62 M.J. at 184). In *United States v. Halpin*, the CAAF extended the *Fletcher* test to improper sentencing argument. 71 M.J. 477, 480 (C.A.A.F. 2013). In some cases, "the third factor may so clearly favor the [G]overnment that the appellant cannot demonstrate prejudice." *Sewell*, 76 M.J. at 18 (citing *Halpin*, 71 M.J. at 480).

"In applying the *Fletcher* factors in the context of an allegedly improper sentencing argument, we consider whether trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the appellant was sentenced on the basis of the evidence alone." *Halpin*, 71 M.J. at 480 (alteration, internal quotation marks, and citation omitted).

The CAAF has identified five indicators of severity of improper argument:

> (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument[;] (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted).

In assessing prejudice, the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

"Trial counsel is entitled to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Frey*, 73 M.J. at 248 (internal quotation marks and citation omitted). As with findings argument, "trial counsel is at liberty to strike hard, but not foul, blows" during sentencing argument. *Halpin*, 71 M.J. at 479 (internal quotation marks and citation omitted). "[T]he argument by a trial counsel must be viewed within the context of the entire court-martial." *Baer*, 53 M.J. at 238. "The focus of our inquiry should not be on words in isolation, but on the argument as viewed in context." *Id.* (internal quotation marks and citations omitted).

### 3. Analysis

Because there was no objection during trial counsel's sentencing argument, we analyze this issue under a plain error standard of review. After closely examining trial counsel's sentencing argument in its entirety, we find Appellant has failed to establish any error, let alone plain or obvious error.

Taken in context, the passage highlighted by Appellant appears to be making two points. First, trial counsel's argument appears to note that the matters presented by Appellant in mitigation did not overcome his reckless and wanton actions in killing AB and injuring three of his fellow Airmen. Viewed in conjunction with trial counsel's entire sentencing argument, the point trial counsel was making was that all the mitigation evidence presented by Appellant did not, as trial counsel stated, "right his wrong" or make Appellant's actions "somehow less" wrong. Trial counsel made this very point again later when he argued: "And we spoke about that as matters in mitigation. But it is completely overshadowed by his convictions for reckless driving and manslaughter."

The second point by trial counsel concerned Appellant's defense that the actions of others involved, AB and FC, were also negligent and deserved some blame. Trial counsel was responding to the Defense's theory and seemed to be pointing out that the attempts to deflect blame that occurred both before and during trial impacted the way Appellant's character witnesses, and Lt Col SR in particular, viewed this case. Lt Col SR's testimony on one hand accepted the members' guilty verdict, but on the other hand suggested some disagreement with the findings. The focus of trial counsel's argument was not, as Appellant characterizes it on appeal, "deriding" Appellant's unit for "their adherence to a basic tenet of the Bill of Rights." Instead, we read trial counsel's argument as an attempt to highlight how Appellant placed blame at his victims' feet and how his unit "blindly assumed" Appellant's version of events—even in the face of evidence directly to the contrary and even contrary to Appellant's convictions at trial. This becomes particularly clear in the portion of sentencing argument where, in trying to make the members understand why individuals in Appellant's unit felt the way they did about Appellant's culpability, trial counsel stated: "And you can see why through the [interview by Appellant's insurance company] audio. You can see how he portrayed this incident. Because he thinks he's the victim."

We do not find plain error in trial counsel's sentencing argument. However, even if we were to assume that Appellant could demonstrate plain or obvious error, he has failed to demonstrate any material prejudice or that the error substantially influenced the adjudged sentence. *See United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018). We reach this conclusion based on the severity of Appellant's crimes, and the weight of the evidence supporting the conviction. We are therefore confident that Appellant was sentenced based on the evidence alone. *See Halpin*, 71 M.J. at 480. Accordingly, we find Appellant is not entitled to relief on this issue.

**E. Ineffective Assistance of Counsel**

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124. In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id.* (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Id.* (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474–75 (C.A.A.F. 2005).

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to

trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410. "Strategic choices made by counsel after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Akbar*, 74 M.J. at 379 (alterations, internal quotation marks, and citation omitted).

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

Appellant contends that he received ineffective assistance from his trial defense counsel. Specifically, Appellant asserts that his counsel were deficient for "failing to object to trial counsel's improper closing and sentencing arguments." As stated above, we find no error, plain or otherwise, in either trial counsel's findings and rebuttal argument or sentencing argument. Therefore, we do not find that trial defense counsel's performance was "measurably below the performance ordinarily expected of fallible lawyers" for failing to object to trial counsel's arguments. *Polk*, 32 M.J. at 153 (alterations, internal quotation marks, and citation omitted). Additionally, as part of our review, we received declarations from both of Appellant's trial defense counsel. In their declarations, both counsel articulated reasonable strategic decisions for not objecting during trial counsel's closing, rebuttal and sentencing arguments, and we do not second-guess reasonable strategic decisions made by counsel. *See Morgan*, 37 M.J. at 410.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court